CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

08/15/2019
JULIA C. DUDLEY, CLERK
BY:    s/ F. COLEMAN
       DEPUTY CLERK

## IN THE U.S. DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

**RUTH ANN WARNER, as Guardian of
JONATHAN JAMES BREWSTER WARNER,**

       *Plaintiff*,

**v.**

**CENTRA HEALTH, INC.,**
<u>Please Serve</u>:
Holly B. Trent
Registered Agent
1901 Tate Springs Road
Lynchburg, VA 24501 (Lynchburg City, VA)

**and**

**BASKERVILL ARCHITECTURE, INC.,**
<u>Please Serve</u>:
Brent G. Farmer
Registered Agent
101 S 15th Street, Suite 200
Richmond, VA 23219 (Richmond City, VA)

**and**

**WESLEY THOMAS GILLESPIE**

**and**

**MICHAEL DUNLOP**

**and**

**MICHAEL E. JUDD**

**and**

**KATHERINE PRATER**

**and**

**CASE NO.** ___6:19CV00055___

**JURY TRIAL DEMANDED**

**JAMES BARR (aka JAMES BARD)**

**and**

**DANA LUCK,**

      *Defendants*.

## COMPLAINT

Plaintiff, Ruth Ann Warner, in her capacity as Guardian of Jonathan James Brewster Warner (hereinafter "Warner" or "Jonathan"), by the undersigned attorneys, alleges as follows and demands judgment, jointly and severally, against the above-named Defendants:

1.       This case alleges claims arising under both federal and state law stemming from the treatment, detention, and ultimate shooting of Jonathan Warner at Centra Health's Psychiatric Emergency Center at Lynchburg General Hospital. Jonathan Warner came to LGH for psychiatric care in a safe setting, but instead found himself the victim of conscious-shocking callousness, ineptitude, and outright intentional wrongdoing. The result was a senseless and tragic shooting, perpetrated against an individual with serious mental illness, in a place where no gun should have been, by an individual with no business carrying a firearm around, or interacting with, mentally ill individuals. The shooting left Jonathan a wheelchair-bound paraplegic. This senseless tragedy was not just foreseeable, but as will be set forth herein, specifically foreseen just months before it occurred.[1]

## PARTIES

2.       Jonathan Warner is an adult resident of Amherst County, Virginia. As the next of kin and mother of Jonathan Warner, Ruth Ann Warner qualified and was duly appointed as the

---

[1]       All claims asserted herein were previously asserted in suits filed in the Circuit Court for the City of Richmond, and one of which was transferred to the Circuit Court for the City of Lynchburg. With the agreement of Defendants, these claims are being consolidated in a single complaint and filed in Lynchburg.

2

Guardian of Jonathan James Brewster Warner, in the Amherst County Circuit Court Clerk's Office on July 14, 2017. A copy of the Certificate of Qualification is attached as Exhibit A.

3.     Defendant Centra Health, Inc. ("Centra") is a Virginia non-stock corporation in the business of operating hospitals and medical facilities throughout the Commonwealth of Virginia.

4.     Defendant Wesley Thomas Gillespie ("Gillespie") is a resident of Bedford County, Virginia and on January 11, 2016 was employed by Centra as a security guard.

5.     Defendants Michael Dunlop ("Dunlop") and Michael E. Judd ("Judd") were physicians employed by Centra on January 10 and 11, 2016.

6.     Defendant Katherine Prater ("Prater") was employed by Horizon Behavioral Health on January 10 and 11, 2016.

7.     Defendants James Barr ("Barr") and Dana Luck ("Luck") were both employed by Centra on January 10 and 11, 2016.

8.     All employees named herein were acting in the course and scope of their employment.

9.     Defendant Baskervill Architecture, Inc. ("Baskervill") is a Virginia corporation with a principal place of business at 101 South 15th Street, Suite 200, Richmond, Virginia 23219. Baskervill is engaged in, among other pursuits, the design of medical and mental health facilities.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this matter under 28 U.S.C. § 1331 because numerous claims asserted herein arise under federal law, and has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367 because they arise out of the same transaction or

occurrence as the federal claim.

11.     Venue is proper in this Court because the conduct complained of herein occurred in the City of Lynchburg.

<b>FACTS COMMON TO ALL COUNTS</b>

**A.      The PEC in Lynchburg**

12.     Centra owns and operates Lynchburg General Hospital ("LGH").

13.     Lynchburg General Hospital serves the Lynchburg metropolitan area, which includes Amherst County.

14.     Lynchburg General Hospital instructs patients suffering from acute mental illness to report to the emergency room of Lynchburg General Hospital for assessment and treatment.

15.     Jonathan had reported to the emergency room of Lynchburg General Hospital many times in the past for adjustment of psychotropic medication and he was familiar with the process.

16.     Until November of 2015, the standard practice in place at Lynchburg General Hospital for patients suffering from mental illness was for the patient to report to the emergency room of Lynchburg General Hospital for medical assessment and, if the patient needed to be admitted for psychiatric care, then for the patient to be transported to Virginia Baptist Hospital.

17.     In November of 2015, the standard practice was modified and acute voluntary psychiatric patients at LGH began to be escorted for psychiatric assessment, after medical clearance in the emergency room, to a newly constructed, freestanding Psychiatric Emergency Center ("PEC") located in a nearby building situated on the grounds of LGH.

18.     The PEC at Lynchburg General Hospital was also known as the "CIT Center" and

4

the "Psychiatric Assessment Center."

19.     The PEC came about as a result of a Memorandum of Understanding between Centra, Horizon Behavioral Health ("Horizon")[2] and the Lynchburg Police Department.

20.     The PEC was funded, at least in part, by a grant from the VDBHDS upon application by Horizon.

21.     The PEC was not licensed by VBDHDS to provide psychiatric services to patients.

22.     Lynchburg General Hospital was not licensed by VDH to provide psychiatric services to patients; in fact Centra did not apply to VDH for such a license.

23.     Centra was obligated to provide medical, administrative, and security staff for the PEC.

24.     Centra was primarily responsible for the construction of the PEC.  Centra engaged Defendant Baskervill to provide design and architecture services in connection with the construction of the PEC.

25.     Baskervill holds itself out as having experience and expertise in the design of medical facilities generally and mental health facilities specifically.

26.     There are industry standards and best practices regarding the design of mental health facilities, with the goal of providing a safe, comfortable, non-confrontational, and confidential environment for individuals experiencing mental health crises to seek treatment. Among other things, a facility should have a separate, contained admission room with a

---

[2]      Horizon is a community services board established pursuant to Code of Virginia § 37.2-500 that provides mental health treatment and assessment services to residents of the City of Lynchburg and several surrounding counties.

controlled access point from the outside and then a controlled access point to the rest of the facility. This is due to the fact that the staff usually has very little information about a new patient and needs a setting in which the patient can be assessed and observed and, if necessary, calmed or restrained before the patient obtains access to the rest of the facility. This admission room is necessary both for the safety of the facility staff and the safety of the patient.

27. Baskervill designed the PEC without providing for a separate admissions room. Instead, new patients entered through a small vestibule into an open circulation area with nothing more than a counter separating the circulation area from the nurse's station. Additionally, the doors to the treatment rooms and the bathroom were directly off of this open circulation area, such that new patients would be in the same space as patients that had already been admitted to the PEC. The open, unsecure nature of this circulation area made it impossible for staff to contain or control individuals suffering from mental illness, and provided an immense amount of space for a violent situation to escalate and devolve.

28. The PEC opened in November of 2015. Several months earlier, on March 26, 2015, while the PEC was still in the construction and build-out phase, a member of the Lynchburg-Central Virginia Crisis Intervention Team wrote a memo to employees of both Centra and Horizon raising various issues about the design and function of the PEC. (See Exhibit B) Several aspects of that memo bear upon the present case. In paragraph 3 of the memo, the author notes:

> A conversation should be held and agreement reached about a policy with regard to firearms. When police officers are present, there are firearms present. The more officers, the more firearms. In a crowded facility, like this one with up to 4 or more officers arriving and/or standing by with ECOs, the potential risk of an incident increases exponentially. The surprise factor also increases as more officers tends to increase the confidence level – and with it, perhaps a relaxed

6

attitude – about the presence of firearms.  **A storage area consisting of gun lockers with removable keys or a combination lock should be considered for all officers entering this secure facility.  It is not necessarily the violent patients, but rather those from whom no violent acts are expected, but whose mental state is such that they may do unpredictable and seemingly irrational things, in whom the dangers may lie.**

The author goes on to note:

> Safety and security are among the most important considerations for this facility. Safety and security for patients, staff and others who must use this facility.  In order to assure a reliable and professional capability of all security and police officers associated with this facility, **CIT training must be the minimum standard for persons employed in this capacity**.  Officers need to feel confident when they transfer custody of ECOs, the receiving officer is professionally trained and security conscious to accept the responsibility.  The staff that work in this facility must have this same level of trust and confidence in the security officers in whose hands their own safety is placed.  In addition to CIT training, which focuses on communications techniques, all officers must meet standards for defensive tactics and use of restraining devices and incapacitation techniques and devices. . . . Less well-trained officers are not an acceptable alternative, as their very status of being less well trained is the exact nature of the danger presented.

(bold emphasis added, underlining in original)

29.     Accordingly, upon receipt of this memorandum, Centra was on actual notice of

(1) the need for a firearms policy and storage capability that kept firearms out of the PEC and (2)

the need for all security staff to have received crisis intervention training.

30.     This issue was revived just four days later when an email (see Exhibit C) was sent

on April 1, 2015, again to employees of both Centra and Horizon regarding security and firearms

at the PEC:

> In considering the physical layout of the assessment center further, **I keep returning to thoughts of a "worst case scenario" in which a patient obtains an officer's gun, or is so violent that he/she cannot be physically controlled by security/police present**. I am thinking of a situation in which one or more staff (and security possibly) simply need to retreat from the holding area. Since egress through the main door may not be possible, it seems to me that

7

1. there should be a steel door with suitable lock in the doorway between the Nurses' Station and Security Station into the "Work Area" along the outside wall.

2. In addition, since this would effectively trap those inside, an outside exit should be available from the Work Area. This exit should not be in a direct line with the security door between the Work Area and the Nurses Station/Security Station area.

3. CCTV should be able to monitor the Nurses/Security Station area outside the barrier door to enable those inside the Work Area to know what the out-of-control patient is doing and to check on the condition of any injured person left in the holding area.

4. It would also be a good idea to assure that the doors to both the Storage room and the Supplies/Meds room have locks on the inside (keys kept in Work Area), so that a person unable to retreat into the Work Area before that door is locked could find some shelter in either of these other two rooms.

Other than the outside exit proposed from the Work Area, none of these other suggestions seems to carry and undue cost burden. It is possible that funds from the Horizon Assessment Center grant might be available for these types of expenses.

(emphasis added)

31.     Despite these repeated, explicit warnings, Centra failed to implement many of these suggestions. Upon information and belief,

a.   there was no firearms policy in place when the PEC opened;

b.   there was no locker or storage facility into which police officers or security staff could place their firearms before entering the PEC;

c.   many members of the security staff, including those who were permitted to carry firearms, had not received CIT training;

d.   there was inadequate security, both in number and ability;

e.   and there was not a separate exit implemented into the design of the PEC.

8

32.     Indeed, the April 1, 2015 email proved to be eerily prescient, as the anticipated "worst case scenario" came to fruition just over eight months later on the morning of January 11, 2016.

**B.     Jonathan Warner**

33.     Jonathan Warner was born on January 2, 1988.  He grew up in Amherst County, Virginia and lived there until he was seventeen years old.

34.     Jonathan began to exhibit symptoms of serious mental illness in his teen years.

35.      Before he became an adult, Jonathan was diagnosed with bipolar schizoaffective disorder..

36.     At all times relevant to this complaint, Jonathan suffered with frequent, but intermittent, intense bouts of psychosis, paranoia and depression induced by bipolar schizoaffective disorder.  Jonathan's mental illness caused him to become paranoid as he suffered from delusional thought, violent outbursts, and irrational decision-making.

37.     At the time of the incident complained of herein, Jonathan was not of sound mind.

38.     Jonathan has been hospitalized frequently during his entire adult life to treat his mental illness, including bipolar schizoaffective disorder.

39.     Jonathan has received in-patient mental health treatment numerous times during his entire adult life to be treated for bipolar schizoaffective disorder and his adult life has been punctuated with both voluntary and involuntary admissions, detentions, and commitments necessitated by bouts of mental illness.

40.     Jonathan has been regularly treated for mental illness at Centra facilities for many years.

9

41.     Jonathan has been regularly treated at Horizon for mental illness for many years.

42.     Thus, Jonathan's severe mental illness was well known to both Centra and Horizon prior to the incident giving rise to this Complaint.

43.     In late December, 2015, Jonathan accompanied his mother, sisters and brothers on a trip to visit his aunt in Florida.

44.     During the above-referenced trip to Florida, Jonathan began to exhibit symptoms of mental illness: specifically, mania, anxiety, confusion, agitation and insomnia.

45.     Jonathan's mother, Ruth Warner, recognized the above-referenced symptoms as being consistent with an imbalance in the administration of his psychotropic medication.

46.     Jonathan's symptoms steadily worsened during the trip to Florida and during the ride home to Virginia.

47.     Jonathan's symptoms continued to worsen after he and his family returned home.

48.     During the weekend of January 9th and 10th of 2016, Jonathan's symptoms became severe.  He began pacing constantly and he stopped sleeping or eating.  He became incoherent and expressed fear and confusion. It was clear to those around him that Jonathan was suffering from psychosis and paranoia.

49.     After attending church with his family on January 10, 2016, Jonathan's family and friends, including his mother, siblings and two VMI cadets, persuaded Jonathan to go to the emergency room of the Lynchburg General Hospital for treatment.

C.     **The shooting.**

50.     At the time of the incident that is the subject of this suit, Jonathan was a 28 year-old young man.  Before the injuries he suffered as a result of these Defendants' negligence, when

he was properly medicated, he was able to live a happy life at his mother's home. Periodically, he would suffer symptoms of bipolar schizoaffective disorder (including anxiety, depression and insomnia and psychosis) and when these flare-ups occurred, he would seek treatment at Centra or Horizon facilities.

51.     Aside from his mental health problems, Jonathan was physically fit and able-bodied.

52.     On January 10, 2016, at approximately 9:00 p.m., Jonathan went with his family to the Centra Lynchburg General Hospital's emergency room to be treated for psychosis and other symptoms of bipolar schizoaffective disorder.

53.     Jonathan was accompanied by his mother, two sisters, three brothers and two friends who were VMI cadets when he arrived at the emergency room of LGH at approximately 9:00 p.m. on January 10, 2016.

54.     Jonathan was placed in Bay 2 of the emergency room at LGH and remained there until approximately 4:15 a.m. on the morning of January 12, 2016.

55.     At approximately 12:00 a.m. on January 12, 2016, Jonathan had not been medically cleared for psychiatric assessment.

56.     At approximately 12:00 a.m., Jonathan's family members needed to leave to return to their home (nearly 30 miles away) in order to put his younger siblings to bed for the school night, so they left him in the care of LGH, which, based on prior experience, they believed would provide a safe environment to treat his deteriorating condition.

57.     Ruth Warner talked with the nursing staff before she left the emergency room – she left contact information, she requested a call from the treating physician and she warned the

11

duty nurse that Jonathan was unstable and physically very strong.

58.     While at the emergency room on January 10-11, 2016, Jonathan was examined by Dr. Michael Dunlop.  Dr. Dunlop consulted with Dr. Judd, a psychiatrist, to determine the appropriate course of action.

59.     Horizon is the local community services board responsible for conducting the evaluation necessary for issuing an Emergency Custody Order ("ECO").

60.     On January 10, 2016, Horizon employee David Walker was designated by Horizon to conduct the above-described evaluations at Lynchburg General Hospital.

61.     On January 10, 2016, Dr. Dunlop requested that Walker speak with Jonathan.

62.     On January 10, 2016, Walker spoke with Jonathan and recommended that Dr. Dunlop obtain an Emergency Custody Order from the magistrate in order to place Jonathan into custody for further evaluation.

63.     An ECO is issued by a magistrate upon a finding that the subject is a danger to himself or others, and requires law enforcement to take the subject into custody for transfer to a licensed custodial mental health facility.

64.     To obtain the above-referenced Emergency Custody Order, the magistrate must find, based on evidence presented to him or her, that Jonathan was a person who at the time of the petition (i) had a mental illness and that there existed a substantial likelihood that, as a result of mental illness, Jonathan would, in the near future, (a) cause serious physical harm to himself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or (b) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs, (ii) was in need of hospitalization or

12

treatment, and (iii) was unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

65.     Late at night on January 10, 2016, or very early in the morning of January 11, 2016, Dunlop petitioned the magistrate for an ECO from the magistrate to take Jonathan into custody.  In doing so, Dunlop swore under oath that Jonathan met the legal criteria for an ECO referenced above.

66.     After attending to other patients, Dunlop asked other Centra staff if the ECO had been served on Jonathan and learned that the magistrate had faxed the ECO to the PEC fax machine instead of the ER fax machine.

67.     Despite the issuance of the ECO, Jonathan was kept in the emergency room for several hours, during which time his paranoia and psychosis continued to worsen.

68.     The issuance of an ECO imposes mandatory, nondiscretionary duties upon Centra and Horizon staff to execute the ECO by taking the subject into custody immediately.  Code of Virginia § 37.2-808(B) requires that any person for whom an emergency custody order is issued shall be taken into custody and transported to a convenient location to be evaluated to determine whether the person meets the criteria for temporary detention pursuant to § 37.2-809 and to assess the need for hospitalization or treatment, and the statute further demands that the evaluation shall be made by a person designated by the community services board who is skilled in the diagnosis and treatment of mental illness and who has completed a certification program approved by the Department.

69.     Jonathan's case was eventually handed off from Walker to Horizon employee, defendant Katherine Prater ("Prater").

70.     Walker called Prater and informed Prater that Jonathan's case "had turned into an ECO" and asked Prater to come to the emergency room to handle Jonathan's case.

71.     Prater arrived at the emergency room at approximately 1:00 a.m. on January 11, 2016.

72.     Prater interviewed Jonathan several times on January 11, 2016.

73.     Jonathan was familiar with the ECO process, and expected that he would be taken into custody and transferred to an appropriate, secure mental health facility at Virginia Baptist Hospital.

74.     Prater understood that regulations required the ECO to be served upon Jonathan once it was issued.

75.     Two Centra security officers, defendant Dana Luck ("Luck") and defendant James Barr ("Barr"), asked Prater what was going on with Jonathan's case because they were being told to hold back the ECO.

76.     As a custodial patient, Jonathan did not meet the admission criteria for the PEC, which was a purely voluntary facility.  Thus, had the ECO been executed upon Jonathan as required, Jonathan could not have been treated at the PEC and would instead have had to be transferred to a properly licensed and secured facility for treatment.

77.     Nevertheless, Centra staff, as part of a *de facto* policy to steer business to its new PEC, to deprive individuals like Jonathan of their due process, and/or to detain individuals like Jonathan on their premises, attempted to persuade Jonathan to "voluntarily" admit himself to the PEC while keeping the ECO in their back pocket.  They did so despite knowing that Jonathan was hallucinating and not of sound mind, and knowing that the magistrate had already made a

14

finding of probable cause to believe that Jonathan was "unwilling to volunteer or incapable of volunteering for hospitalization or treatment" by virtue of the ECO having been issued pursuant to Virginia Code § 37.2-808(A).

78.     According to Prater an agreement was made amongst several of the named Defendants to transfer Jonathan to the PEC without executing the ECO and to later execute the ECO if Jonathan was "active or whatever" in the PEC.

79.     After speaking with Jonathan, Prater spoke with Dr. Dunlop and informed Dr. Dunlop that Jonathan was hearing voices.

80.     Prater informed Dr. Dunlop that she believed that they should "hold on the ECO for now" but that they should "have it ready" in case Jonathan "tries to leave, tries to do anything" and that they would "do it at that point."

81.     Dr. Dunlop agreed with the scheme to keep the ECO in their back pocket rather than execute it as required.

82.     Jonathan was not at all familiar with the PEC, and in his paranoid and psychotic state, anything unfamiliar was likely to exacerbate his symptoms.

83.     As part of the plan to have Jonathan "voluntarily" admit himself to the PEC, Jonathan was escorted from the emergency room by armed guards in the early morning of January 11, 2016, to the PEC.  At approximately 4:15 a.m. on January 11, 2016, Wesley Gillespie and Barr, both security guards employed by Centra, escorted Jonathan to the PEC.   Both guards walked into the PEC armed with semiautomatic handguns and/or other weapons.

84.     Jonathan was in custody and was not free to leave when he was escorted to the PEC.

15

85.     Gillespie was the security officer responsible for serving the above-referenced ECO upon Jonathan.

86.     Gillespie was not a health care provider at any time relevant to this complaint.

87.     Gillespie did not perform or furnish any treatment to or for Jonathan at any time relevant to this complaint.

88.     Gillespie was hired by Centra as an unarmed security officer on May 10, 2010.

89.     When he was hired by Centra on May 10, 2010, Gillespie was 62 years old.

90.     When he was hired by Centra on May 10, 2010, Gillespie had not worked as a police officer or security officer for more than 33 years.

91.     Gillespie was employed as a police officer by the Lynchburg Police Department from 1969 to 1974.

92.     Upon termination of his employment by the Lynchburg Police Department, Gillespie was hired as a security officer by the K-Mart store on Wards Road in Lynchburg.

93.     Gillespie worked as a security officer for the K-Mart store on Wards Road from April of 1974 to August of 1976.

94.     Gillespie stated that he left the job at K-Mart to attend college, but he does not have a college degree.

95.     Between the termination of his employment as a K-Mart security officer in 1976 and his employment by Centra in 2010, Gillespie had various jobs working as a car salesman and working as a pastor or other employee of various churches and religious institutions.

96.     In January of 2011, Centra petitioned the Lynchburg Circuit Court for the appointment of Gillespie as a Special Conservator of the Peace pursuant to Code of Virginia

§19.2-13.

97.     On August 23, 2013, Centra petitioned the Lynchburg Circuit Court to reappoint Gillespie as a Special Conservator of the Peace.

98.     The above-referenced August 23, 2013 petition requested that Gillespie be authorized to carry a weapon.

99.     The above-referenced August 23, 2013 petition requested that Gillespie be limited in authority to acting with the "direction and discretion" of Centra.

100.     The above-referenced August 23, 2013 petition was granted by the Lynchburg Circuit Court by order entered on August 29, 2013.

101.     As a Special Conservator of the Peace, on January 11, 2016, Gillespie had been granted the powers of a "law-enforcement officer" by order of the Lynchburg Circuit Court pursuant to Code of Virginia § 37.2-808 et seq. and  Code of Virginia § 16.1-335.

102.     The August 29, 2013 order of the Lynchburg Circuit Court limited Gillespie's authority to the direction and discretion of Centra.

103.     On January 11, 2016, Gillespie was less than week away from his 68th birthday.

104.     On January 11, 2016, Gillespie weighed at least 225 pounds.

105.     Gillespie supervised the other Centra security guards on duty at the Emergency Room of Lynchburg General Hospital on January 11, 2016.

106.     Gillespie was authorized and required to execute Emergency Custody Orders issued by the magistrates of Virginia on individuals under his authority on the LGH grounds.

107.     Gillespie first interacted with Jonathan at approximately 3:30 a.m. on January 11, 2016.

17

108.     Jonathan was in Bay #2 of the Lynchburg General Hospital Emergency Room when Gillespie first interacted with Jonathan.

109.     Gillespie knew, before his first interaction with Jonathan, that an ECO had been issued.

110.     Jonathan was seized, as contemplated the Fourth Amendment to the United States Constitution, at all times after the ECO was issued and received by Centra and/or Horizon personnel.

111.     Gillespie had not received the CIT training deemed to be the "minimum standard" in the March 26th memo discussed above.

112.     Upon arrival at the PEC, Gillespie told the obviously mentally ill Jonathan to call for him if he needed anything, and thereafter left Jonathan at the PEC.

113.     Though specifically designed to be a mental health treatment facility by Baskervill, which touts itself as having special expertise in the design of mental health facilities, the PEC failed to meet numerous industry standards in the design and layout of mental health treatment facilities as stated above.

114.     Once in the PEC, Jonathan, whose symptoms of psychosis had worsened over the six hours he spent in the ER without treatment, began to panic.

115.     Centra staff in the PEC knew that an ECO had been issued for Jonathan, that Centra had decided, pursuant to its policy described above, not to serve the ECO on Jonathan, and that PEC policy did not permit the admission of patients subject to an ECO.

116.     Jonathan asked the Centra nurse on duty to call for Gillespie.

117.     Gillespie returned to the PEC.  Gillespie did not have any backup security officers

18

with him when he returned, and at no time did he request any until after the shooting.

118. As stated above, Centra had been repeatedly put on notice of the danger of admitting weapons in the PEC. Nevertheless, Gillespie re-entered the PEC armed with a .40 caliber Glock semiautomatic pistol, a TASER model X26 electric discharge weapon and pepper spray when he returned to the PEC.

119. Inside the PEC, Jonathan was experiencing severe mental torment under the influence of psychosis and paranoia.

120. For approximately the next 25 minutes, Gillespie engaged Jonathan in conversation.

121. Gillespie was not acting at the direction of, or under the supervision of, any health care professional when interacting with Jonathan upon his return to the PEC, and was not providing healthcare to Jonathan. His actions were about to make the situation far worse.

122. Gillespie's conversations with Jonathan turned to religious themes that only exacerbated Jonathan's symptoms. This engagement ran afoul of central tenets of crisis intervention training. Jonathan's psychosis was so severe and obvious that the experienced Centra nurse on duty in the PEC immediately realized they rendered Jonathan's medical emergency extremely dangerous.

123. For the next twenty minutes, Gillespie attempted to coerce Jonathan into signing a "voluntary" admission form, but Jonathan refused and began to pace frantically throughout the open, uncontained central processing area of the PEC.

124. When Jonathan balked at signing the voluntary admission paperwork, Gillespie began to threaten Jonathan with detention, injections and restraints.

19

125.    These kinds of threats and coercion only served to exacerbate Jonathan's condition and also ran afoul of the CIT tenets that had been touted as the minimum standard for working in the PEC.

126.    Indeed, during this encounter, PEC staff was coming and going, and one other PEC patient exited her room and walked past Jonathan to go to the bathroom, even further upsetting Jonathan and exacerbating his paranoia.

127.    At approximately 4:30 a.m., a nurse at the PEC, Melea Moore ("Moore"), called the pharmacy and notified the staff member there that it was imperative that Jonathan receive Haldol, Ativan and Cogentin immediately.

128.    Haldol, Ativan and Cogentin are medicines used collectively to treat acute psychosis.

129.    At approximately 4:35 a.m., Moore went to the back room and told another nurse to call the pharmacy and to inform the staff member there that if the requested medicine was not provided within five minutes "we were going to have a Code Atlas".

130.    "Code Atlas" is a phrase that means a patient is out of control.

131.    The pharmacy could not provide the requested medicine because Centra staff members neglected to properly document his transfer to the PEC.

132.    Moore knew that Jonathan was becoming unstable and she quietly told another PEC staff member to remove his badge and to put his pen away.  She set aside her cell phone because she "knew it was coming."

133.    Moore knew that "it was a race against the clock" to get Jonathan's medicine. However, upon information and belief, Moore failed to advise Gillespie of her concerns about

20

Jonathan's deteriorating condition and likelihood of a disturbance, nor did she call and request any additional help to come to the PEC.

134.    At approximately 4:41 a.m., Moore made a final, but tragically unsuccessful attempt to retrieve Jonathan's medicine from the AcuDose automated dispensary.

135.    Gillespie continued to interact with Jonathan and eventually confronted Jonathan directly face-to-face and made a sudden hand gesture – conduct that no properly trained security officer would employ in a secure facility with a patient suffering from psychosis.

136.    At approximately 4:43 a.m., the "worst case scenario" foretold in the April 1, 2015, email to Centra and Horizon employees came to fruition when Jonathan finally snapped. At this point, Jonathan was in a fully psychotic state which caused him to be unable to control his actions and/or to distinguish right from wrong.  Voices in his head were telling him to kill himself to save his family.

137.    While standing in the open circulation area, Jonathan attempted to take Gillespie's firearm from its holster on Gillespie's right hip.  A struggle ensued, with Jonathan, Gillespie, and another Centra employee, Jason Bryan ("Bryan") careening around the open circulation area.

138.    Gillespie's holster was a Level 3 retention holster.

139.    A Level 3 retention holster has security features designed to prevent the firearm from being released accidentally or by other persons.

140.    Jonathan was unable to release Gillespie's Glock pistol from its holster.

141.    Gillespie eventually used his left hand to release the TASER.  Jonathan grabbed the TASER, pulled it out of Gillespie's grip, and discharged it harmlessly into a wall.  The other Centra employee unsuccessfully attempted to tackle Jonathan after the TASER had been

21

discharged and Jonathan chased that employee with the discharged TASER into a patient room.

142.    Gillespie's understanding at the time was that the discharged TASER was incapable of incapacitating anyone.  While in the patient room, Jonathan hit Bryan once with the body of the discharged TASER without shocking him and without seriously injuring him. Gillespie did not witness this event.

143.    Jonathan thereafter exited the patient room back into the main area and ran toward the only exit of the PEC.

144.    Just as Jonathan left the patient room to return to the open circulation area, Gillespie fired multiple shots from his Glock pistol in rapid succession, penetrating Jonathan's torso, leg and arm.

145.    Jonathan attempted to run past Gillespie's left side toward the PEC's only exit door.  As Jonathan passed Gillespie, Gillespie fired again, causing Jonathan to fall to the ground.

146.    Jonathan continued to try to flee the PEC when Gillespie turned toward Jonathan and fired a final shot into Jonathan's back.

147.    A security camera recorded Jonathan in the PEC from the time of his arrival until Gillespie shot him and thereafter.

148.    The final shot severed Jonathan's spinal column and paralyzed him from the chest down.  Jonathan also suffered severe injuries to his lung and intestines.

149.    Jonathan spent weeks in the intensive care units of two hospitals as well as weeks recovering in a hospital in Richmond and in a nursing home in Portsmouth.  As a result of the shooting, Jonathan lost all movement of his legs and he will carry urine and ostomy bags with him for the rest of his life.

150.     Jonathan continues to suffer severe damages, including acute physical pain,

emotional pain, anguish, depression, humiliation, isolation, exacerbation of his mental illness,

loss of consortium, loss of earnings, loss of mobility and freedom and a reduced life expectancy

as result of the injuries he sustained at the hands of the defendants and he will continue to suffer

greatly every waking hour of every day of the remainder of his life.

### COUNT ONE – UNREASONABLE SEIZURE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION – 28 U.S.C. § 1983 – DEFENDANTS GILLESPIE, LUCK, BARR, AND PRATER

151.     All preceding paragraphs incorporated herein by reference.

152.     The Fourth Amendment to the United States Constitution, as incorporated by the

Fourteenth Amendment, provides to all persons the clearly established right to be free from

unreasonable and unlawful seizure.

153.     At no time material to this Complaint was Jonathan free to leave LGH and/or the

PEC.  He was thus seized as contemplated by the Fourth Amendment.

154.     The Defendants named in this count seized Jonathan by force, or by

demonstration of force, on January 11, 2016, without probable cause to believe Jonathan had

committed any crime in violation of Jonathan's constitutional rights.

155.     All Defendants named in these counts were acting under the color of state law in

their efforts to detain and coerce Jonathan into admitting himself to the PEC.

156.     Gillespie acted in concert with defendants Luck, Barr, and Prater when Jonathan

was seized on January 11, 2016.

157.     Gillespie, Luck and Barr were in uniform, armed with lethal and non-lethal

weapons when they seized Jonathan on January 11, 2016.

23

158.     Gillespie's order of appointment as a Special Conservator of the Peace by the Lynchburg Circuit Court nominated him a "law enforcement officer" for the purposes of Code of Virginia § 37.2-808.

159.     Gillespie was acting under the color of Code of Virginia § 37.2-808 when he took Jonathan into custody without executing the ECO issued by the magistrate.

160.     Gillespie was acting under color of Code of Virginia § 37.2-808 when he shot Jonathan multiple times on January 11, 2016.

161.     Although Gillespie, Luck and Barr were private actors, they were acting under color of authority of state law and were engaged in detaining and transporting a custodial patient – an exclusively governmental function.

162.     These Defendants' acts of detaining Jonathan to coerce him into admitting himself into the PEC despite knowing he had already been found incapable of making decisions for himself shocks the conscience of any reasonable person.

163.     These Defendants' acts of seizing Jonathan deprived Jonathan of liberty in violation of the Fourth Amendment to the United States Constitution.

164.     These Defendants' acts of detaining and seizing Jonathan were a proximate cause of Jonathan's injuries and his damages.

165.     Jonathan is entitled recover damages, including compensatory and punitive damages, from these Defendant as a result of their unreasonable and unlawful seizure on January 11, 2016.

166.     Jonathan is entitled to recover his costs and reasonable attorney's fees incurred in bringing this action from these Defendants.

24

167.    As private actors performing a governmental function under the color of state law in a competitive position with a private corporation (Centra), Gillespie, Luck and Barr are not entitled to assert qualified immunity from liability.

## COUNT TWO –EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION – 28 U.S.C. § 1983 – DEFENDANT GILLESPIE

168.    All preceding paragraphs incorporated herein by reference.

169.    The Fourth Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment, provides to all persons the clearly established rights to be from the exercise of excessive force by those acting under color of state law.

170.    Gillespie's order of appointment as a Special Conservator of the Peace by the Lynchburg Circuit Court nominated him a "law enforcement officer" for the purposes of Code of Virginia § 37.2-808.

171.    Gillespie was acting under color of Code of Virginia § 37.2-808 at all times during his interaction with Jonathan, including when he shot Jonathan four times on January 11, 2016.

172.    Gillespie's acts of shooting Jonathan were not objectively reasonable because Gillespie knew that the Taser Jonathan held was incapable of incapacitating anyone and that Jonathan posed no immediate threat to anyone since the TASER had been discharged harmlessly and was otherwise unarmed.

173.    Gillespie's acts of shooting Jonathan were not objectively reasonable because Gillespie was armed with pepper spray and should have deployed it or used other less forceful methods instead of shooting Jonathan.

25

174. Gillespie's acts of shooting Jonathan were not objectively reasonable because a properly trained officer in Gillespie's position would have known that it was reckless and dangerous to introduce a firearm into the confrontation with Jonathan after Jonathan discharged the Taser harmlessly into a wall inside the PEC.

175. Gillespie's acts of shooting Jonathan were not objectively reasonable because, to whatever extent the circumstances were exigent, Gillespie had created the exigency by engaging the psychotic and delusional Jonathan in theological debate, coercing and threatening him with voluntary admission into the PEC, and taking confrontational stances and movements toward Jonathan.

176. Separate and apart from Gillespie's initial shots, the final shot was clearly excessive, and likely malicious, as Jonathan was on his knees, struggling to reach the exit door and facing away from Gillespie when Gillespie shot Jonathan in the back, paralyzing Jonathan from the chest down in the process.

177. Gillespie's acts of shooting Jonathan shocks the conscience of any reasonable person.

178. Gillespie's acts shooting Jonathan deprived Jonathan of liberty in violation of the Fourth Amendment to the United States Constitution.

179. Gillespie's acts of shooting Jonathan were a proximate cause of Jonathan's injuries and his damages.

180. Jonathan is entitled recover damages, including compensatory and punitive damages, from Gillespie due to Gillespie's use of excessive force in shooting Jonathan on January 11, 2016.

26

181.    Jonathan is entitled to recover his costs and reasonable attorney's fees incurred in bringing this action from Gillespie.

182.    As a private actor performing a governmental function under the color of state law in a competitive position with a private corporation (Centra), Gillespie is not entitled to assert qualified immunity from liability.

**COUNT THREE – DEPRIVATION OF DUE PROCESS IN VIOLATION OF THE FOURTH, FIFTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION – 28 U.S.C. § 1983 – DEFENDANTS GILLESPIE, PRATER, LUCK, AND BARR**

183.    All preceding paragraphs are incorporated herein by reference.

184.    The Fifth Amendment to the United States Constitution, as incorporated by the Fourteenth Amendment, and the Fourteenth Amendment itself, guarantees to all persons the clearly established right to the due process of law.

185.    At no time material to this Complaint was Jonathan free to leave LGH and/or the PEC.  He was thus deprived of liberty as contemplated by the Fifth and Fourteenth Amendments.

186.    Moreover, at all times material to this claim Jonathan was the subject of an ECO that entitled him to certain due process, including being placed in actual custodial restraint to protect him from himself and others, and being transferred to a secure and safe facility.

187.    All of these Defendants were acting in concert under the color of state law in their deprivation of Jonathan's liberty and the efforts to coerce Jonathan into admitting himself to the PEC.

188.    Although Gillespie, Luck and Barr were private actors, they were acting under color of authority of state law and were engaged in detaining and transporting a custodial patient – an exclusively governmental function.

27

189.     These Defendants' acts of depriving Jonathan of his liberty as part of their scheme to coerce him into admitting himself into the PEC despite knowing he had already been found incapable of making decisions for himself shock the conscience of any reasonable person.

190.     These Defendants' acts of refusing to serve the ECO upon Jonathan, thus depriving him of the due process guaranteed to one having been placed into custody under an ECO, in furtherance of their efforts to steer Jonathan to the PEC shock the conscience of any reasonable person.

191.     These Defendants' acts of depriving Jonathan of his rights to due process were in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

192.     These Defendants' acts of depriving Jonathan of his rights to due process were a proximate cause of Jonathan's injuries and his damages.

193.     Jonathan is entitled recover damages, including compensatory and punitive damages, from these Defendants as a result of their deprivation of due process on January 11, 2016.

194.     Jonathan is entitled to recover his costs and reasonable attorney's fees incurred in bringing this action from these Defendants.

195.     As private actors performing a governmental function under the color of state law in a competitive position with a private corporation (Centra), Gillespie, Luck and Barr are not entitled to assert qualified immunity from liability.

### COUNT FOUR – MUNICIPAL LIABILITY OF CENTRA HEALTH, INC. - POLICYMAKER LIABILITY FOR UNREASONABLE SEIZURE, EXCESSIVE FORCE, AND DUE PROCESS VIOILATION BY CENTRA EMPLOYEES – 28 U.S.C. § 1983

196.     All preceding paragraphs incorporated herein by reference.

197.     Centra was responsible for providing security staff at the PEC and the emergency

28

room of the Lynchburg General Hospital on January 10, 2016, when Jonathan arrived at the emergency room, and Centra remained responsible for providing security staff at the PEC and emergency room at all times thereafter.

198.    Centra petitioned the Lynchburg Circuit Court for the appointment of Gillespie as a Special Conservator of the Peace pursuant to Code of Virginia 19.2-13.  Centra employees drafted and submitted Gillespie's order of appointment as Special Conservator of the Peace to the Lynchburg Circuit Court for endorsement and entry.

199.    Gillespie's order of appointment as Special Conservator of the Peace was in full force and effect on January 10, 2016 when Jonathan arrived at Lynchburg General Hospital and remained in full force and effect at all times relevant to this Complaint.

200.    Gillespie's order of appointment specifically limited his authority to acts within the direction and discretion of Centra.

201.    As a corporation, Centra exercises its direction and discretion through policies or customs.

202.    Centra maintained an unconstitutional policy or custom of allowing its armed security guards and other employees the direction and discretion to seize patients without due process or probable cause and to use excessive force against patients.  Examples of Centra's security guards acting in accord with its unconstitutional policies or customs include:

     a.  The unlawful detention and wounding of a patient who left the hospital against medical advice less than a month after Jonathan was shot.

     b.  Several known instances of using a TASER against patients who posed no threat of harm.

29

c.  Several known instances of the unlawful use of restraints against patients shortly before Jonathan was shot.

203.  Gillespie and other Centra employees described herein were acting within the direction and discretion of Centra and in accord with Centra's unconstitutional policies or customs when they refrained from executing the ECO upon Jonathan as required.

204.  Gillespie was acting within the direction and discretion of Centra and in accord with Centra's unconstitutional policies or customs when he shot Jonathan multiple times on January 11, 2016.

205.  As a private entity performing a governmental function, Centra competes with other health care providers to provide psychiatric services.

206.  Centra's unconstitutional policies or customs were a proximate cause of Jonathan's injuries.

207.  Jonathan is entitled to recover damages, including compensatory and punitive damages, incurred due to Centra's policies or customs.

208.  Jonathan is entitled to recover his costs and reasonable attorney's fees incurred in bringing this action.

**COUNT FIVE - BATTERY**

209.  All preceding paragraphs are incorporated herein by reference.

210.  Gillespie shot Jonathan multiple times on inside the PEC on January 11, 2016 with a Glock .40 caliber pistol, including once in the back as Jonathan crawled on the floor away from Gillespie.

211.  Jonathan did not consent to being shot by Gillespie on January 11, 2016.

30

212.     Gillespie was not justified in shooting Jonathan because Gillespie knew (and reported to the police department investigators) that the discharged Taser Jonathan held was incapable of incapacitating anyone.  Gillespie also knew that the Taser was incapable of "drive stun" execution at the time he shot Jonathan multiple times because Gillespie observed that the cartridge had not been removed from the Taser.

213.     Gillespie's use of force against Jonathan on January 11, 2016 was excessive.

214.     Gillespie had other means of securing the facility without shooting Jonathan, including the pepper spray he carried with him.

215.     Jonathan suffered injuries including permanent paralysis, permanent damage to his lungs and intestines, severe mental injury, pain, anguish and complete and permanent loss of sexual function as a result of being shot by Gillespie.

216.     Gillespie shot Jonathan intentionally each of the multiple times Gillespie shot Jonathan on January 11, 2016.

217.     Centra is liable for Gillespie's battery of Jonathan under the doctrine of respondeat superior because Gillespie was acting within the scope of his employment by Centra at all times while he shot Jonathan.

## COUNT SIX – NEGLIGENCE AND GROSS NEGLIGENCE OF CENTRA

218.     All preceding allegations are incorporated herein by reference.

219.     At all times relevant hereto Centra acted through its agents and employees, both identified herein and unnamed.

220.     At all times relevant hereto, Centra held itself out as being able to provide a safe facility for individuals experiencing severe mental health problems.

31

221. Centra owed such individuals, like Jonathan, a duty to use reasonable care to provide adequate security and a safe environment, apart from medical care, when such individuals came to Centra seeking help.

222. Centra breached said duties to Jonathan in a host of ways, including but not limited to:

    a.   failing to adopt and/or enforce a reasonable firearms policy to ensure that firearms were not present in the PEC;

    b.   failing to provide a secure location for law enforcement and security personnel to place their firearms prior to entering the PEC;

    c.   failing to use reasonable care in the hiring and training of individuals charged with providing security at the PEC, including Gillespie;

    d.   entrusting inadequately trained and qualified security personnel, such as Gillespie, with deadly weapons around severely mentally ill individuals;

    e.   failing to provide adequate, appropriately trained security staff at the PEC;

    f.   failing to provide CIT training to all staff, such as Gillespie, involved with individuals at the PEC;

    g.   failing to design the PEC in a manner that anticipates an incident such as what occurred with Jonathan and provides structural abilities to avoid the need to escalate the situation into the use of deadly force;

    h.   failing to design the PEC in a manner that separated individuals undergoing intake and admission screening from the rest of the facility; and

    i.   otherwise failed to provide proper security or a proper, safe facility for psychiatric

patients.

223. The acts and omissions described above, individually and cumulatively constitute negligence and gross negligence by Centra.

224. As a direct and proximate result of Centra's structural, security, and institutional failings described herein, Jonathan suffered severe injuries as described herein.

## COUNT SEVEN – MEDICAL MALPRACTICE

225. Defendants Dunlop, Judd, Prater and Centra were healthcare providers who established a provider-patient relationship with Jonathan.

226. These Defendants each owed a duty to Jonathan to comply with the standard of care for a reasonably prudent physician and/or healthcare provider in the Commonwealth of Virginia.

227. Defendants had a duty to exercise reasonable care and diligence in their medical care and treatment of Jonathan.

228. Notwithstanding that duty, Defendants deviated from the appropriate standards of care in the following ways:

a. they failed to transfer Jonathan to another, appropriate facility for treatment;

b. they failed to provide the appropriate, necessary treatment for Jonathan's deteriorating mental health condition;

c. they failed to ensure that Jonathan had access to and received the appropriate medications to mitigate the effects of his psychosis;

d. they failed to ensure that Jonathan's mental condition was properly managed and/or that Jonathan was adequately sedated before letting him leave the emergency room;

e. they failed to comply with the applicable standards of care under the circumstances then and there existing; and/or

33

229.    As a direct and proximate result of the negligent acts and omissions of the

Defendants, Jonathan suffered serious injuries including permanent paralysis, permanent damage

to his lungs and intestines, severe mental injury, pain, anguish and complete, permanent loss of

sexual function and other injuries described herein.

230.    In addition to being liable for its own direct negligence, Defendant Centra is

vicariously liable for all negligent acts and omissions of Defendants as alleged above, as all such

acts and omissions occurred in the normal course and scope of Defendants' employment or

agency.

## COUNT EIGHT – NEGLIGENT DESIGN OF THE PEC BY DEFENDANT BASKERVILL ARCHITECTURE, INC.

231.    All preceding paragraphs are incorporated herein by reference.

232.    At all relevant times, Baskervill had a duty to patients and staff to design the PEC

in a reasonably safe manner and in keeping with industry standards and best practices to provide

a safe environment in which to treat psychiatric patients.

233.    Notwithstanding these duties, Baskervill failed to act with care of those ordinarily

skilled in the business of architecture.

234.    Baskervill's negligence included, but is not limited to:

   a.  designing the PEC with a single means of ingress and egress such that there was

       no alternative means of evacuation possible in the event of an emergency;

   b.  designing the PEC in such a manner that there was inadequate safe means of

       evacuation for staff or patients;

   c.  designing the PEC such that it did not contain a separate admissions and

screening room. Thus, new, unknown patients, who by virtue of this being a

psychiatric treatment facility are often a danger to themselves or others, had full

access to the entire PEC and were processed and admitted in the same area as

other patients;

    d.  failing to design the facility in such a way that the firearms could be safely stored

        away from residents; and

    e.  failing to design a safe and secure facility for psychiatric patients.

235.    Baskervill's negligent design of the PEC was a proximate cause of the severe

personal injuries sustained by Jonathan.

236.    Jonathan is entitled to recover from Baskervill damages due to the injuries he

suffered.

## DAMAGES

237.    All preceding paragraphs are incorporated herein.

238.    As a direct and proximate result of the acts and omissions described herein,

jointly and severally, Jonathan has suffered severe, painful debilitating, and lifelong personal

injuries. He is a wheelchair-bound paraplegic. Because of his lack of lower body muscle

control, he is required to urinate and defecate into bags. He has lost sexual function. He needs

uninterrupted, daily, supervised medical care, and will so need for the rest of his life. He has

incurred substantial medical costs, and will continue to incur substantial medical costs for the

rest of his life. He has lost the ability to earn a wage or otherwise support himself financially.

He has suffered and will continue to suffer from extreme emotional distress and depression as a

result of his lack of independence and mobility.

239.    In addition to compensatory damages, Jonathan is entitled to prejudgment interest from January 11, 2016.

WHEREFORE, Plaintiff Ruth Ann Warner, as Guardian of Jonathan James Brewster Warner, demands judgment against the Defendants, jointly and severally, for compensatory and punitive damages in an amount to be decided by the jury, plus prejudgment interest, and his costs in this behalf expended.

**PLAINTIFF DEMANDS TRIAL BY JURY**

Respectfully submitted,
**RUTH ANN WARNER, as Guardian of**
**JONATHAN JAMES BREWSTER WARNER**
**By Counsel**

/s/ M. Bryan Slaughter
M. Bryan Slaughter, Esquire (VSB No. 41910)
E. Kyle McNew, Esquire (VSB No. 73210)
MICHIEHAMLETT
P.O. Box 298
Charlottesville, Virginia  22902
(434) 951-7200; (434) 951-6464 Facsimile
bslaughter@michiehamlett.com
kmcnew@michiehamlett.com

M. Paul Valois (VSB No. 72326)
JAMES RIVER LEGAL ASSOCIATES
7601 Timberlake Road
Lynchburg, Virginia 24502
(434) 845-4529; (434) 845-8536 Facsimile
mvalois@vbclegal.com

*Counsel for Plaintiff*

Dated: August 15, 2019

36