IN THE U.S. DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| RUTH ANN WARNER, as Guardian of JONATHAN JAMES BREWSTER WARNER | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| CENTRA HEALTH, INC., et al., | ) ) |
| Defendants. | ) ) |

Civil Action No. 6:19CV00055

## PLAINTIFF'S OPPOSITION TO DEFENDANT CENTRA, INC.'S MOTION TO DISMISS

COMES NOW the Plaintiff, by counsel, and opposes the Motion to Dismiss filed by Defendant Centra Inc. (ECF 23) on the following grounds:

## INTRODUCTION

This case focuses on a shooting that should never have been permitted to get to that point, of a young man who never should have been there. Many individuals and entities are links in the causal chain that resulted in Jonathan Warner—in an acutely psychotic state completely divorced from reality—lashing out and ultimately laying on the floor, his spinal cord severed by a security guard's bullet. But in many ways, Centra is the tie that binds. Its failure began months prior to the incident in question, when it completely ignored specific warnings and directions on how to design, operate, and staff the PEC. It continued on the night in question when Centra decisionmakers acted on a policy of coercing mental health patients to go to the PEC even in the face of an Emergency Custody Order having been issued for that patient. Centra tasked Mr. Gillespie, among others, with executing on that policy. And so, by virtue of Centra's decision

months earlier to ignore these common-sense suggestions, Mr. Warner ended up in the PEC being lectured on religious subjects by someone who was both armed and completely unqualified to interact with individuals suffering from acute mental health emergencies. The "worst case scenario" of which Centra had previously been explicitly warned came to fruition, resulting in Mr. Warner's injuries.

### Factual Background

Centra, in conjunction with Horizon Behavioral Health and the Lynchburg Police Department, conceptualized the PEC as a crisis intervention facility, in part to provide an alternative to custodial mental health treatment. In March of 2015, while it was still being designed and built, one of the individuals who had been involved with planning for the PEC—the Lynchburg Police Department Crisis Intervention Coordinator—sent a series of memos to Centra and others on the PEC team. The first memo specifically warned of the problem inherent when firearms and mentally ill individuals are in the same location. He recommended having a locked storage area for security staff and law enforcement officers to leave their weapons before entering the PEC, and noted that "it is not the violent patients, but rather those from whom no violent acts are expected, but whose mental state is such that they may do unpredictable and seemingly irrational things, in whom the dangers may lie." (Compl. ¶28.) He also highlighted the need to have qualified, properly trained staff, and specifically security staff, manning the PEC. "In order to assure a reliable and professional capability of all security and police officers associated with this facility, CIT training must be the minimum standard for persons employed in this capacity." (*Id.*)

Four days later, a second memo was sent. The author stated that "I keep returning to

thoughts of a 'worst case scenario' in which a patient obtains an officer's gun, or is so violent that he/she cannot be physically controlled by security/police present." And so, in addition to the gun policy and the CIT training requirement that he had previously raised, the author suggested a series of design elements that would allow those inside the PEC to escape or isolate themselves from the foreseeable out-of-control patient. (*Id.* ¶30.)

Yet, when it opened the PEC in November 2015, Centra had not followed any of these common-sense recommendations. Unlike in its other psychiatric facilities, it had no policy against firearms being present in the PEC and no place for security staff or law enforcement to securely store their weapons. It had not required that the security staff working in the PEC receive CIT training. It had not implemented any design elements that would mitigate the danger posed by an out of control patient. (*Id.* ¶31.) The stage was thus set—what had been explicitly foreseen and warned against in March and ignored by Centra in November came to fruition in January when Mr. Warner arrived at the PEC in a state of severe decompensating psychosis.

Mr. Warner did not arrive in the PEC of his own accord. He had initially come to Lynchburg General Hospital Emergency Department with his family because he was suffering from an acute mental health break. Healthcare providers associated with both Centra and Horizon assessed Mr. Warner and determined, due to his continually worsening condition and erratic behavior, that the proper course of action was to seek an Emergency Custody Order. (*Id.* ¶¶58-62.) Centra staff took the steps necessary to seek the ECO, and late in the evening of January 10, 2016, the ECO was issued by the magistrate. (*Id.* ¶65-66.) So far, so good. What should have happened next was set forth in the ECO itself and in Virginia Code § 37.2-808. Both the ECO and § 37.2-808(B) commanded that Mr. Warner be taken into custody and

3

transported to an appropriately secure, convenient location to be evaluated by a qualified individual. The statute further mandates that the facility to which the individual is transferred be both "licensed to provide the level of security necessary to protect both the person and others from harm" and "actually capable of providing the level of security necessary to protect the person and others from harm." Va. Code § 37.2-808(E). The purpose of the mandated evaluation is to determine whether the person meets the criteria for temporary detention, needs hospitalization or treatment, or instead does not meet the criteria for temporary detention or need treatment, and thus can be released from custody. (*Id.* ¶68; Va. Code § 37.2-808.) All of this process exists, of course, to protect both the rights and needs of the patient and the needs of the community.

But none of that happened. Instead, Centra and Horizon staff, in an effort to steer business to the PEC, held the ECO back while they tried to convince Mr. Warner to admit himself to the PEC. Stated differently, this was not a situation where the ECO was executed upon Mr. Warner, Horizon or Centra conducted the examination called for by the ECO, and determined further detention or treatment was unnecessary. They instead planned to use it as a backup for purposes of their primary policy of steering patients to the PEC, which was a voluntary admission facility only. This, of course, despite the fact that the ECO only existed because Mr. Warner had been deemed a danger to himself or others and unable to consent to voluntary treatment. (*See generally* Compl. ¶¶75-81.) Moreover, despite the statute explicitly requiring that Mr. Warner be transferred to an appropriately licensed facility actually capable of providing the level of security necessary to protect Mr. Warner and others from harm, the PEC was not licensed. (*Id.* ¶¶21-22.)

4

To execute on this policy, two Centra security guards, Mr. Gillespie and Mr. Barr, transported Mr. Warner from the emergency department to the unlicensed PEC. They were both armed and in uniform, and Mr. Warner had no reasonable belief that he had any choice but to go where they told him to go. (*Id.* ¶¶83-84.) And, of course, Mr. Gillespie had not received the CIT training that was deemed to be the "minimum standard" of any security personnel interacting with PEC patients. (*Id.* ¶111.) They left Mr. Warner at the PEC, but Mr. Gillespie soon returned when Mr. Warner became even more bewildered and paranoid.[1] (*Id.* ¶¶112, 114-117.) Mr. Gillespie spent the next approximately twenty-five minutes speaking with Mr. Warner in a manner that would qualify for a training video of how not to interact with someone in the middle of a psychotic break. The discussion turned to religious themes, which only exacerbated Mr. Warner's paranoia and psychosis. (*Id.* ¶120-22.) Confirming the fact that Mr. Warner was never really free to leave, Mr. Gillespie began threatening Mr. Warner with detention, injections, and restraints if he did not accede to Centra's desires of voluntarily admitting himself to the PEC. (*Id.* ¶¶123-24.)

Meanwhile, other PEC staff saw that the powder keg was close to explosion. They were working frantically to gain access to the pharmaceutical cocktail used to calm and subdue individuals who are losing control. However, because of the unorthodox manner in which Mr. Warner had come to the PEC, the staff was unable to access these medications. (*Id.* ¶¶127-31.)

Gillepsie continued to harangue Mr. Warner until his psychosis got the best of him. (*Id.*

---

[1] Centra claims that the video from inside the PEC was "incorporated into" the Complaint, such that it may be considered for purposes of the motion to dismiss. But nowhere in the Complaint does the Plaintiff expressly incorporate the video by reference. Instead, the reference to the video was simply to show that the allegations about what occurred in the PEC was based on a video rather than just a dramatic retelling of events by Plaintiff or his counsel. Nevertheless, Plaintiff has no objection to the Court considering the video as a whole (and not just the freeze frames cherry picked by Centra and dropped into its brief), as nothing in the video contradicts allegations in the Complaint.

¶136.) Mr. Warner lunged for Mr. Gillespie's firearm, but was unable to free it from the holster. When Mr. Gillespie pulled out his TASER, Mr. Warner grabbed it and then immediately discharged it into a wall. At that point, Mr. Gillespie's belief was that the discharged TASER was no longer able to deliver any kind of stun. (*Id.* ¶141-42.)

All the while, because of Centra's failure to implement the design elements that had been previously suggested, no one else in the PEC was able to leave, and there was no way to just isolate Mr. Warner in the intake area until Centra could get a sufficient security force there to subdue Mr. Warner safely. One of the PEC staff that had been trying to help subdue Mr. Warner attempted to flee into another room. Mr. Warner briefly chased him into that room, at which point Mr. Gillespie lost sight of Mr. Warner and did not know what happened in that room. Mr. Warner quickly reemerged, still holding the body of the discharged TASER. Immediately upon his reemergence, Mr. Gillespie began firing. He shot at Mr. Warner three times, causing Mr. Warner to fall down on his stomach, facing away from Mr. Gillespie. As Mr. Warner began to push his upper body off the ground, Mr. Gillespie fired a final shot into Mr. Warner's back, severing his spinal cord. (*Id.* ¶¶141-48.)

## ANALYSIS

A.     **The Complaint state a *Monell* claim against Centra.**

The *Monell* doctrine provides for § 1983 liability against an entity, as opposed to an individual, that engages in constitutionally offensive conduct in furtherance of the entity's "policy or custom." *Milligan v. Newport News*, 743 F.2d 227, 229 (1984). A policy or custom can arise in four ways: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission,

such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003). Though a policy may certainly be formalized, it may "also be found in formal or informal *ad hoc* policy choices or decisions of" officials authorized to make such decisions. *Spell v. McDaniel*, 824 F.2d 1380, 1385 (4th Cir. 1987). The policy "may be pronounced or tacit and reflected in either action or inaction." *Hixson v. Hutcheson*, No. 5:17cv32, 2018 U.S. Dist. LEXIS 130360, at *15 (W.D. Va. Aug. 3, 2018) (quoting *Vail v. City of New York*, 68 F. Supp. 3d 412, 431 (S.D.N.Y. 2014)).

The deliberate indifference by omission theory of liability is satisfied when the defendant has actual or constructive knowledge of a deficiency in its policies or training program that causes its employees to violate a citizen's constitutional rights and nevertheless chooses to retain that system. *See, e.g.*, *Carrero v. Farrelly*, 270 F. Supp. 3d 851, 864 (D. Md. 2017). The deliberate indifference standard is met when the defendant "disregarded a known or obvious consequence of his action," or that the consequence was "highly predictable." *Id.* at 864-65 (quoting *Connick v. Thompson*, 563 U.S. 51, 61, 64 (2011)); *see also Bd. of Cnty. Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997) ("[A] violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.").

Moreover, in certain circumstances, a single incident can establish a *Monell* claim. In *Canton v. Harris*, 489 U.S. 378 (1989), the Court recognized the possibility of single-incident liability under a failure-to-train theory. And in *Pembaur v. Cincinnati*, 475 U.S. 469 (1986), the Court recognized the viability of single-incident *Monell* liability under a policy-making authority

7

theory.  Both of these make sense, because it is the policy or custom that offends the constitution.  The incident is just the result, and an entity should not get a mulligan the first time just because a particular incident is the first (known) time an unconstitutional policy or custom causes injury.  That is especially true in situation like this one.  The PEC was essentially brand new.  It did not really have any formalized policies about anything,[2] and so Centra's policymakers were often concocting policies on the fly to address a specific situation.  This appears to have included the policy deployed against Mr. Warner of using custody coercively against mentally ill individuals to obtain "voluntary" admission to the PEC.

      The facts alleged in this Complaint support *Monell* liability against Centra under multiple theories.  Chronologically, Centra first made a conscious, knowing decision to refrain from properly training its security officers and staff on how to interact with mentally ill individuals.  As alleged in the Complaint, Centra was told by one of its planning partners, the Lynchburg Police Crisis Intervention Coordinator, that CIT training should be the "minimum standard" for security staff working in the PEC and interacting with people like Mr. Warner, who were in the midst of mental health crises.  And yet Centra merely shrugged off that suggestion.  There is nothing in the Complaint to support any inference or belief that Centra had any basis or justification for that decision, other than mere indifference.  And by virtue of the same memo that told Centra of the need for CIT training and a gun policy, it also became highly probable and foreseeable to Centra that failure to enact these policies would lead to just this kind of situation.  There is a straight line running through (1) Centra's deliberate failure to enact these policies and

---

[2] This was confirmed by a Center for Medicare & Medicaid Services investigation following the shooting of Mr. Warner, *available at* http://www.hospitalinspections.org/report/22745.  Despite being told by Centra staff that the "PEC was an extension of the ED and was under the policies and procedures of the ED," the investigating team was unable to locate any mention of the PEC whatsoever in the Emergency Department policies and procedures that were provided by Centra.

provide the CIT training, (2) Mr. Gillespie engaging with Mr. Warner on religious issues and threatening a paranoid schizophrenic with injections and restraints, and (3) Mr. Warner lashing out in an irrational and uncontrolled manner.

Then, on the night in question, Mr. Gillespie was a participant in the decision to hold back the ECO rather than executing it. That decision resulted in both Mr. Warner's unlawful detention by use of threat and a deprivation of the process owed to him by virtue of the issuance of the ECO. If Mr. Warner was going to be seized, then it had to be done in accordance with the ECO. He had to be afforded either the process guaranteed to him by the ECO and its supporting legal framework or process that could plausibly be described as a viable substitute. None of that happened, and it was because of Mr. Gillespie's decision. As alleged in the Complaint, Mr. Gillespie was the supervising security officer at Lynchburg General, and was the officer responsible for executing ECOs. (Compl. ¶¶85, 105-06.) He was therefore in a position to make policy decisions about security and how ECOs would be handled. On the night of January 11th, he made just such a decision when he decided to hold back the ECO and use his position as an armed security officer and Special Conservator of the Peace to threaten and coerce Mr. Warner into admitting himself to the PEC. Mr. Gillespie was acting on behalf of Centra, and his actions blatantly violated Mr. Warner's constitutional rights.

Finally, the Complaint provides a litany of examples of other similar incidents of Centra security playing fast and loose with patients' constitutional rights. (Compl. ¶202.) Though this is the only incident that ended with gunshots, that is simply the result. The tie that binds these incidents is a pervasive practice by Centra security guards of improperly using force—both physical force and threat of force—to mistreat patients. At the time of this incident, Centra

security thought they were the law, and that the rights of patients like Mr. Warner were subordinate to the desires of Centra and its security staff.

For all of these reasons, the *Monell* claim should not be dismissed as a matter of law.

**B.     The Complaint states a plausible claim for battery.**

Centra contends that Mr. Gillespie's decision to use lethal force against Mr. Warner was, as a matter of law, reasonable, and so the vicarious liability claim against Centra for Mr. Gillespie's battery must fail. There is not much disagreement about the generally applicable legal framework—officers may deploy lethal force when they reasonably believe that doing so is necessary to protect themselves or others from serious physical harm. (ECF 24 at 21). The issue here is that a reasonable jury could conclude that Mr. Gillespie possessed no such reasonable belief when he shot Mr. Warner.

To be sure, Mr. Warner had tried to take Mr. Gillespie's firearm. But the fact of the matter is that he was not successful, and so Mr. Gillespie was still the only person in the PEC armed with a firearm. Instead, Mr. Warner had gotten hold of the TASER, but then immediately discharged it. Mr. Gillespie's understanding was that, because it had been discharged, the TASER was then incapable of seriously harming anyone. (Compl. ¶142.) Moreover, Mr. Gillespie was not aware of Mr. Warner having tried to hit anyone with the body of the TASER. So, the facts known to Mr. Gillespie when Mr. Warner exited the side room and began running toward the door were that Mr. Warner did not possess any kind of dangerous weapon like a gun or knife that could have seriously injured Mr. Gillespie or anyone else. Instead, Mr. Gillespie simply knew that Mr. Warner was running toward a locked door, meaning there was also no risk of escape. In sum, all of the purported justifications for Mr. Gillespie's use of deadly force are

not found in the allegations in the Complaint, and are often directly contradicted by them.

Even if the Court were to believe that Gillespie's initial decision to shoot at Mr. Warner was justified, that still cannot account for the fourth shot. *See, e.g.*, *Waterman v. Batton*, 393 F.3d 471, 477 (4th Cir. 2005) (in an analogous excessive force claim, analyzing a shooting shot-by-shot, and finding that while the initial shots were not actionable, the second group of shots were). As alleged in the Complaint, there was an initial volley of three shots, which caused Mr. Warner to fall to the ground on his stomach. He was facing away from Mr. Gillespie, raising up to his knees. There is nothing in the Complaint to suggest that Mr. Gillespie gave Mr. Warner any verbal commands to freeze or lay back down, and he certainly did not try to use the opportunity to try to physically detain Mr. Warner. Instead, he shot Mr. Warner in the back, severing his spinal cord. Under the circumstances described in the Complaint, this was a separate and distinct use of force, and a reasonable jury could find that it was not justified.

Finally, as described in the Complaint, Mr. Gillespie created the circumstances that led to the exigency he uses to justify his use of force. Under analogous federal doctrine, when law enforcement officers impermissibly create an exigency "by engaging or threatening to engage in conduct that violates the Fourth Amendment," they may not then use that exigency as a basis to justify a Fourth Amendment violation. *Kentucky v. King*, 563 U.S. 452, 462 (2011). That is exactly what happened here. Mr. Gillespie unlawfully seized Mr. Warner. Then, despite knowing that Mr. Warner was mentally decompensating and paranoid, he threatened him with detention, injections, and restraints if he did not concede to Mr. Gillespie's demands—demands that Mr. Gillespie had absolutely no lawful right to make. Mr. Warner's reaction directly ensued. This is exactly the situation where Mr. Gillespie threated conduct that would violate the Fourth

11

Amendment, creating a perceived exigency. The same logic should apply to the battery claim under Virginia law. An officer should not be allowed to engage in unlawful conduct that provokes a foreseeable reaction, and then use that provoked reaction as justification for the use of deadly force. Centra's request to have the state law battery claim dismissed should be denied.

**C.     The Complaint states a negligence claim against Centra.**

Centra's final series of arguments take aim at Count Six of the Complaint, which alleges negligence against Centra. Mind, this is the *exact same* claim for negligence that was alleged against Centra in the nonsuited case that was litigated for close to a year in Lynchburg Circuit Court. During that entire time, Centra never suggested that the complaint failed to state a claim for negligence. So, somehow a negligence claim that was adequate under Virginia law in state court has, according to Centra, become insufficient now that the case has moved a couple blocks down the street.

The main flaw in Centra's analysis is that it takes subparagraphs in paragraph 221 and then asks whether each particular subparagraph, standing alone, is sufficient to state a claim. And even though many of those subparagraphs would be sufficient to support a claim for negligence on their own, that is not the proper lens of analysis. Rather, the claim must be viewed as a whole, not picked apart line-by-line. *See, e.g.*, *Harman v. Unisys Corp.*, 746 F. Supp. 2d 755, 760 (E.D. Va. 2010) ("In considering a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff, *read the complaint as a whole*, and take the facts asserted therein as true.") (emphasis added) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *see also Albright v. Oliver*, 510 U.S. 266, 268 (1994)).

Taken as a whole, Count Six alleges that Centra created an unsafe environment, governed

by unsafe practices, staffed by unqualified employees. The PEC was physically unfit for its intended purpose. Then, once it was up and running, the PEC was governed by unsafe practices because it permitted firearms to be in the same space as mentally ill, volatile individuals. And the security staff working at the PEC were simply not qualified to work there interacting with those kinds of patients. There are many different ways that Centra could have rectified these problems, and paragraph 222 alleges a handful of them. But the fact remains that the negligence claim is based on the Complaint as a whole, not just individual subparagraphs.

Plaintiff now address some of the strawman arguments that Centra makes with regard to certain subparagraphs. First, Plaintiff is not making a stand-alone negligent hiring or retention claim in the abstract. Mr. Gillespie and other Centra security staff may have been perfectly fit to serve as security guards in a standard hospital setting. But this claim is specific to the PEC. And given their lack of training specific to working with and around the acutely mentally ill, they were not qualified to be working in the PEC. Centra had a duty to make sure the PEC was adequately staffed, be that through hiring people that already possessed the necessary skills or through providing the necessary training to its existing staff to bring them up to standard. Centra did neither, and so it was negligent.

Second, and similarly, Plaintiff is not making a stand-alone negligent entrustment claim. Instead, the allegation in paragraph 222(d) works in conjunction with other allegations. There should not have been firearms on the PEC, period. (Compl. ¶222(a) & (b).) There should not have been people working on the PEC who were not qualified to deal with the acutely mentally ill. (*Id.* ¶222 (c), (e) & (f).) And those two things certainly should not be occurring at the same time. That is what subparagraph (d) is about. Unqualified people should not have firearms

around the acutely mentally ill.  Plaintiff is not saying that Mr. Gillespie should not have been entrusted with a firearm for all purposes (quite frankly because Plaintiff does not need to fight that fight).  This is about a specific incident that happened in a specific setting.  Plaintiff is simply saying that Centra should not have let Mr. Gillespie carry his firearm in the PEC.  Centra had explicitly been told as much before the PEC even opened, and just ignored it.

Third—and if the refrain is getting monotonous, it cannot be avoided—Plaintiff is not making a stand-alone negligent training or supervision claim.  Plaintiff is simply saying that Centra did not have the right kind of people providing security in the PEC.  For example, a claim that a truck driver was not qualified to drive the truck is not a claim of negligent training against the trucking company.  A claim that a doctor was not qualified to perform the procedure in question is not a claim of negligent training or supervision against the hospital.  They are both simply claims that the defendant had the wrong people doing the job.

Fourth, Centra's reliance upon the *Godsey/Pullen* doctrine is misplaced.  That doctrine stands for the proposition that a company's violation of its own private policies or rules cannot, standing alone, form the basis of a claim for negligence.  But that is not Plaintiff's claim here.  Plaintiff is not trying to hold Centra liable for violating any of its own policies or rules.  Instead, Plaintiff seeks to hold Centra liable for its failure to use reasonable care to ensure that firearms stayed out of the PEC.  Centra had been told that there should not be firearms on the PEC by someone uniquely situated to speak to the standard of care in these situations.  The way that Centra would have complied with this standard is to have enacted a policy prohibiting firearms on the PEC.  The negligence claim is not about the violation of a private policy or rule, which is what the *Godsey/Pullen* doctrine speaks to.  It is about the failure to have any kind of policy or

practice in place at all.

Fifth, a reasonable jury could easily conclude that the negligence described in Count Six proximately caused Mr. Warner's injuries. This type of situation—where an acutely mentally ill individual loses control and tries to get hold of a firearm—is highly foreseeable, hence the memos from the Lynchburg Police Department Crisis Intervention Coordinator. And the precautions described in his memos are ways to prevent or mitigate the impact of those situations. That translates to proximate cause. Had Mr. Gillespie not had a firearm, Mr. Warner could not have lunged for it. Had Mr. Gillespie been qualified through CIT training, he would not have engaged Mr. Warner in the extended religiously charged dialogue and haranguing that ended pushing Mr. Warner over the edge. Had the PEC been properly designed, everyone could have vacated the premises, isolating Mr. Warner until security staff were in a position to subdue him with appropriate measures. Mr. Gillespie would have had no perceived need to use deadly force. All of these things combined to proximately cause this event.

Finally, a reasonable jury could find that Centra's conduct was grossly negligent. As Centra states, gross negligence is a complete indifference to a danger that displays an utter disregard of prudence. When Centra was specifically told that it should take steps to prohibit firearms on the PEC and to make sure that its staff was adequately trained to handle the patients who would be on the PEC, Centra's complete failure to follow any of these recommendations qualifies as gross negligence.

## **CONCLUSION**

For the reasons stated above, Centra's motion to dismiss should be denied.

                                                             Respectfully submitted,
                                                 RUTH ANN WARNER, as Guardian of
                                          JONATHAN JAMES BREWSTER WARNER
                                                                          By Counsel

\_\_\_\_/s/ E. Kyle McNew_____
M. Bryan Slaughter, Esquire (VSB No. 41910)
E. Kyle McNew, Esquire (VSB No. 73210)
MICHIEHAMLETT
310 4th Street NE
P.O. Box 298
Charlottesville, Virginia 22902
(434) 951-7200; (434) 951-6464 Facsimile
bslaughter@michiehamlett.com
kmcnew@michiehamlett.com

M. Paul Valois (VSB No. 72326)
JAMES RIVER LEGAL ASSOCIATES
7601 Timberlake Road
Lynchburg, Virginia 24502
(434) 845-4529; (434) 845-8536 Facsimile
mvalois@vbclegal.com

*Counsel for Plaintiff*

16

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd day of December, 2019, a true and accurate copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to the following:

Stephan F. Andrews, Esquire (VSB No. 23756)
J. Brandon Sieg, Esquire (VSB No. 84446)
O'HAGAN MYER, PLLC
411 E. Franklin Street, Suite 500
Richmond, VA 23219
(804) 403-7100
(804) 403-7110 Facsimile
sandrews@ohaganmeyer.com
bsieg@ohaganmeyer.com
*Counsel for Baskervill Architecture, Inc.*

Elizabeth Guilbert Perrow, Esquire (VSB No. 42820)
Daniel T. Sarrell, Esquire (VSB No. 77707)
Joshua F. P. Long, Esquire (VSB No. 65684)
Joshua R. Treece, Esquire (VSB No. 79149)
J. Walton Milam III, Esquire (VSB No. 89406)
WOODS ROGERS PLC
Post Office Box 14125
Roanoke, VA 24038-4125
(540) 983-7600
(540) 983-7711 Facsimile
eperrow@woodsrogers.com
dsarrell@woodsrogers.com
jlong@woodsrogers.com
jtreece@woodsrogers.com
wmilam@woodsrogers.com
*Counsel for Centra Health, Inc.*

Eric P. Burns, Esquire (VSB No. 76554)
Eric L. Olavson, Esquire (VSB No. 87872)
WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
8444 Westpark Drive, Suite 510
McLean, Virginia 22102
(703) 245-9300
(703) 245-9301 Facsimile
eric.burns@wilsonelser.com
eric.olavson@wilsonelser.com
*Counsel for Dana Luck, James Barr, and Wesley Gillespie*

Jennifer D. Royer, Esquire (VSB No. 68099)
ROYER LAW FIRM, PC
Post Office Box 4525
Roanoke, Virginia 24015
(540) 788-2982
(540) 675-4093 Facsimile
jroyer@royerlawfirm.com
*Counsel for Katherine Prater*

                                                                        /s/ E. Kyle McNew