CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
11/30/2020
JULIA C. DUDLEY, CLERK
BY:  s/ A. Little
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

RUTH ANN WARNER,
*as Guardian of Jonathan James Brewster Warner,*

*Plaintiff,*

v.

CENTRA HEALTH INC., *et al.*,

*Defendants.*

CASE NO. 6:19-cv-55

**MEMORANDUM OPINION**

JUDGE NORMAN K. MOON

Plaintiff Ruth Ann Warner ("Plaintiff"), on behalf of her son Jonathan Warner ("Jonathan"), filed this lawsuit seeking compensatory and punitive damages against numerous defendants involved in the hospitalization and shooting of her son in January 2016, which left him paralyzed from the waist down. Defendant Katherine Prater allegedly facilitated Jonathan's transfer to the mental health facility where he was shot. Defendant Wesley Gillespie was the supervising security guard at Lynchburg General Hospital who shot Jonathan. Defendants James Barr and Dana Luck were security guards who escorted Jonathan to the mental health facility adjacent to the hospital. Defendant Centra Health, Inc. operated the mental health facility where the incident took place. The defendants have all moved to dismiss Plaintiff's claims against them. Dkts. 13, 15, 23.

The Court will grant in part and deny in part the motion to dismiss claims against Defendant Gillespie: dismissing Count I (unreasonable seizure) with prejudice; Count III (due process violation) without prejudice and affording Plaintiff the opportunity to amend; and denying the

1

motion to dismiss Count V (battery), as Plaintiff has pleaded a plausible claim of battery against Gillespie. As to Defendant Centra, the Court will dismiss all counts except Count V (battery), which survives because the facts as pleaded establish a plausible claim for vicarious liability under a theory of *respondeat superior* with respect to Gillespie's battery. The Court will dismiss all claims against Defendants Prater, Barr and Luck.

## I. LEGAL STANDARD

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a complaint to determine whether the plaintiff has properly stated a claim; "it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).

A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000). "Factual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555, with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor, *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 346 (4th Cir. 2005). Rule 12(b)(6) does "not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Consequently, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## II. FACTS AS ALLEGED

Jonathan Warner is a 32-year-old[1] man who was diagnosed with bipolar schizoaffective disorder, and suffers from "frequent, but intermittent, intense bouts of psychosis, paranoia and depression induced by bipolar schizoaffective disorder." *Id.* ¶¶ 33, 35–36. This condition has "caused him to become paranoid as he suffered from delusional thought, violent outbursts, and irrational decision making." *Id.* ¶ 36. He has been hospitalized many times during these episodes, both through voluntary and involuntary admissions, including at Centra and Horizon facilities on several occasions.[2] *Id.* ¶¶ 38–40.

In December 2015, Jonathan accompanied his mother, sisters and brothers to Florida on a vacation to visit family. *Id.* ¶ 43. There, he started exhibiting symptoms of "mania, anxiety, confusion, agitation and insomnia." *Id.* ¶ 44. These symptoms steadily worsened throughout the trip and continued to worsen after returning home to Virginia. *Id.* ¶¶ 46–47. Finally, during the weekend of January 9–10, 2016, the symptoms became severe: Jonathan stopped eating and sleeping altogether, and he became incoherent in his expressions of fear and confusion. *Id.* ¶ 48. On the evening of January 10, 2016, his family and friends persuaded him to go to the emergency room of Lynchburg General Hospital ("LGH") for treatment. *Id.* ¶ 49.

Centra owns and operates LGH. Dkt. 1 ¶ 12. Jonathan had reported to LGH's emergency room "many times in the past for adjustment of psychotropic medication and he was familiar with the hospital's intake process for such treatment." *Id.* ¶ 15. Prior to November 2015, the complaint alleges that the intake practice for psychiatric patients reporting to LGH's emergency room was to

---

[1] 28 years old at the time of the incident. Dkt. 1 ¶ 50.

[2] Horizon is a community services board established pursuant to Va. Code § 37.2-500 that provides mental health treatment and assessment services to residents of the City of Lynchburg and several surrounding counties.

transfer them to Virginia Baptist Hospital if admittance for psychiatric treatment was warranted. *Id*. ¶ 16. After November 2015, however, LGH began "escort[ing]" "acute voluntary psychiatric patients" to a "newly constructed, freestanding Psychiatric Emergency Center ("PEC")." *Id*. ¶ 17. Centra provided medical, administrative, and security staff for the PEC, and was primarily responsible for its construction. *Id*. ¶¶ 23–24.

Jonathan arrived at LGH's emergency room with his family at approximately 9:00 p.m. on January 10, 2016. *Id*. ¶ 52. He was placed in Bay 2 of the emergency room and remained there until approximately 4:15 a.m. on the morning of January 11, 2016. *Id*. ¶ 54. His family left him alone at the hospital at approximately midnight, three hours after arriving at the hospital. *Id*. ¶ 56. Prior to leaving the hospital, Plaintiff Ruth Ann Warner, Jonathan's mother and guardian, spoke with the duty nurse, warning that Jonathan "was unstable and physically very strong." *Id*. ¶ 57.

After his arrival at the emergency room, Dr. Michael Dunlop examined Jonathan and consulted Dr. Michael Judd, a psychiatrist, on the appropriate course of action. *Id*. ¶ 58. Dr. Dunlop then requested an evaluation by David Walker, an employee of Horizon Behavioral Health, the entity tasked with implementing the local community service board, which in turn is responsible for conducting evaluations necessary to issue Emergency Custody Orders ("ECOs"). *Id*. ¶ 59; Va. Code §§ 37.2-808–809. The community service board's designee's job is then to evaluate the patient to determine whether probable cause exists that the patient:

> (i) has a mental illness and that there exists a substantial likelihood that, as a result of mental illness, the person will, in the near future, (a) cause serious physical harm to himself or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or (b) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs, (ii) is in need of hospitalization or treatment, and (iii) is unwilling to volunteer or incapable of volunteering for hospitalization or treatment.

4

Va. Code § 37.2-808. If the designee determines that the above criteria are satisfied, he submits a petition to a magistrate for the issuance of an ECO. *Id*. Virginia law then provides that "any person for whom an emergency custody order is issued shall be taken into custody and transported to a convenient location to be evaluated to determine whether the person meets the criteria for temporary detention pursuant to § 37.2-809 and to assess the need for hospitalization or treatment." *Id*.

Pursuant to this statutory scheme, Walker, the community services board's designee, spoke with Jonathan at Dr. Dunlop's request. Dkt. 1 ¶¶ 61–62. After the evaluation, Walker recommended that Dr. Dunlop obtain an ECO from a magistrate in order to place Jonathan into custody for further supervision. *Id*. ¶ 62. Dr. Dunlop put forward the ECO petition late at night on January 10, 2016, swearing under oath that Jonathan met the legal criteria for the ECO's issuance. *Id*. ¶ 65. However, after issuing the ECO, Jonathan "was kept in the emergency room for several hours, during which time his paranoia and psychosis continued to worsen." *Id*. ¶ 67.

At some point during the evening, Walker handed off Jonathan's case to Katherine Prater, another Horizon employee. *Id*. ¶ 69. Walker informed Prater that Jonathan's case "had turned into an ECO." *Id*. ¶ 70. Prater arrived at the emergency room at approximately 1:00 a.m. on January 11, 2016 and interviewed Jonathan times after arriving. *Id*. ¶¶ 71–72. The complaint alleges that at this time, Jonathan "expected that he would be taken into custody and transferred to an appropriate, secure mental health facility at Virginia Baptist Hospital." *Id*. ¶ 73.

The complaint alleges that it was around this time that "an agreement was made amongst several of the named Defendants to transfer Jonathan to the PEC without executing the ECO and to later execute the ECO if [Plaintiff] was 'active or whatever' in the PEC." *Id*. ¶ 78. This scheme was allegedly necessary because the PEC is a purely voluntary psychiatric facility, rather than a

custodial facility appropriate for an ECO transfer and evaluation. The complaint alleges that Centra staff pursued this scheme "as part of a *de facto* policy to steer business to its new PEC, to deprive individuals like [Jonathan] of their due process, and/or to detain individuals like [Jonathan] on their premises." *Id.* ¶ 77. The complaint further alleges that Defendants pursued this scheme "despite knowing that [Jonathan] was hallucinating and not of sound mind, and knowing that the magistrate had already made a finding of probable cause to believe that [he] was 'unwilling to volunteer or incapable of volunteering for hospitalization or treatment'" as part of the criteria for issuing the ECO. *Id.*

Prater then spoke with Jonathan, afterward informing Dr. Dunlop that Jonathan was hearing voices and that Defendants "should 'hold on the ECO [sic] for now' but that they should 'have it ready' in case [Jonathan] 'tries to leave, tries to do anything' and that they would 'do it at that point.'" *Id.* ¶¶ 79–80. Dr. Dunlop agreed. *Id.* ¶ 81.

At approximately 4:15 a.m., Jonathan was "escorted from the emergency room by armed guards"—Defendants Wesley Gillespie and Bar, security guards at Centra—"in the early morning of January 11, 2016." *Id.* ¶ 83. The complaint alleges that "[b]oth guards walked into the PEC armed with semiautomatic handguns and/or other weapons," and that Jonathan "was in custody and was not free to leave when he was escorted to the PEC." *Id.* ¶¶ 83–84.

Gillespie was one of the two Centra security officers who escorted Plaintiff to the PEC. In 2010, Centra originally hired Gillespie as an unarmed security officer in 2010, but in 2011, Centra successfully petitioned the Lynchburg Circuit Court for the appointment of Gillespie as a Special Conservator of the Peace ("SCOP") pursuant to Va. Code § 19.2-13, which empowered Gillespie to, *inter alia*, effectuate arrests, carry a firearm and other weapons, and to use those weapons in effectuating arrests. Va. Code §§ 37.2-808, 16.1-335. Gillespie supervised the other Centra guards

on duty January 10 and 11, 2016. *Id.* ¶ 105. He was the officer authorized to execute ECOs on LGH grounds at that time. *Id.* ¶ 106.

Gillespie, with his subordinate security officer Barr, transferred Jonathan from Bay 2 at the LGH emergency room to the PEC, where they handed off Jonathan to Centra staff in the PEC. *Id.* ¶¶ 107, 112. Gillespie told Jonathan to call him personally if he needed anything. *Id.* ¶ 112. After the Centra guards departed from the PEC, Jonathan allegedly began to panic, as his "symptoms of psychosis had worsened over the six hours he spent in the ER without treatment." *Id.* ¶ 114. Centra staff in the PEC "knew that an ECO had been issued" for Jonathan but declined to execute it at that time because of Centra's alleged policy not to serve ECOs in order to reroute patients to the PEC. *Id.* ¶ 115. Jonathan, in his panic, requested Centra staff call Gillespie and ask him to return. *Id.* ¶ 116.

Gillespie returned to the PEC without any backup security officers. *Id.* ¶ 117. He was equipped with a .40 caliber Glock semiautomatic pistol, a TASER model X26, and pepper spray. *Id.* ¶ 118. When he arrived, Gillespie and Jonathan spoke for twenty-five minutes. *Id.* ¶ 120. The conversation "turned to religious themes," which "exacerbated [Jonathan's] symptoms" and "ran afoul of central tenets of crisis intervention training." *Id.* ¶ 122. The complaint alleges that Jonathan's "psychosis was so severe and obvious that the experienced Centra nurse on duty in the PEC immediately realized they rendered [Jonathan's] medical emergency extremely dangerous." *Id.*

According to the complaint, Gillespie then spent the next twenty minutes "attempt[ing] to coerce [Jonathan] into signing a 'voluntary' admission form." *Id.* ¶ 123. When Jonathan "balked at signing the voluntary admission paperwork, Gillespie began to threaten [him] with detention, injections and restraints." *Id.* ¶ 124. Jonathan allegedly grew increasingly agitated and unstable

during this period. *Id.* ¶¶ 125–126. One of the nurses in the PEC, Melea Moore, realized the severity of the situation and, at approximately 4:30 a.m., began trying to expedite prescriptions for Haldol, Ativan and Cogentin, which are allegedly used to treat acute psychosis. *Id.* ¶¶ 127–28. She tried expediting these medications again five minutes later, saying that if the medicine was not provided in the next five minutes, "we were going to have a Code Atlas," shorthand for a situation in which the patient is out of control. *Id.* ¶¶ 129–30. However, the medication allegedly could not be provided in time because Centra staff had not yet documented Jonathan's transfer to the PEC. *Id.* ¶ 131. Moore quietly told another staffer to remove his badge and put his pen away; she put her cell phone away because she "knew it was coming." *Id.* ¶ 132. However, she neglected to tell Gillespie of her fears or request additional help. *Id.* ¶ 133.

By 4:43 a.m., Jonathan and Gillespie's conversation escalated to a face-to-face confrontation. When Gillespie made a "sudden hand gesture," which the complaint alleges is "conduct that no properly trained security officer would employ in a secure facility with a patient suffering from psychosis," Jonathan "finally snapped." *Id.* ¶¶ 135–36. He was "in a fully psychotic state which caused him to be unable to control his actions and/or distinguish right from wrong. Voices in his head were telling him to kill himself to save his family." *Id.* ¶ 136.

Jonathan attempted to snatch Gillespie's Glock from the holster on his right hip, but failed. *Id.* ¶¶ 137–40. Gillespie used his left hand to release his TASER, which Jonathan wrestled from Gillespie's grip and discharged "harmlessly into a wall." *Id.* ¶ 141. An unnamed Centra employee then unsuccessfully attempted to tackle Plaintiff, who turned on the employee and chased him into an adjacent patient room with the stolen TASER. *Id.* ¶ 141. The complaint alleges that, although Gillespie could not see what was occurring in the patient room, he would have understood at the time that the TASER, having been discharged, could not be fired again. *Id.* ¶ 142. While in the

patient room, Jonathan allegedly struck the unnamed Centra employee with the body of the discharged TASER one time, though not seriously injuring him. *Id.* ¶ 142.

Jonathan exited the patient room back into the main PEC room and ran toward the exit (presumably with the TASER still in hand). *Id.* ¶ 143. As he entered the main room, "Gillespie fired multiple shots from his Glock pistol in rapid succession, penetrating [Jonathan's] torso, leg and arm." *Id.* ¶ 144. Jonathan attempted to keep running past Gillespie toward the exit, but Gillespie shot Jonathan once more as he passed, causing him to fall to the ground. *Id.* ¶ 145. When Jonathan attempted to rise in order to flee, Gillespie fired a final shot into his back. *Id.* ¶ 146. In total, Gillespie shot Jonathan four times. The fourth (and final) shot allegedly severed Jonathan's spinal column, paralyzing him from the chest down. *Id.* ¶ 148.

As a result of the incident, Jonathan spent two weeks in intensive care. *Id.* ¶ 149. He has lost all movement of his legs, and he now must carry urine and ostomy bags with him wherever he goes. *Id.* He continues to suffer acute physical pain and a host of emotional and mental anguish. *Id.*

The complaint lays part of the blame on the setting in which the shooting occurred. Plaintiff claims that this incident would never have unfolded so violently had Centra properly designed and operated the PEC. The complaint alleges that there are several "best practices" in the design of mental health facilities to maximize safety and minimize opportunities for confrontation. Among these include a separated, contained admissions room with controlled access points with emergency exits to avoid "choke points," and a gun locker to keep firearms out of these close-quartered spaces. *Id.* ¶¶ 25–27. However, the PEC was allegedly designed with none of these things, "provid[ing] an immense amount of space for a violent situation to escalate and devolve." *Id.* ¶¶ 26–27, 31–32. In fact, one member of the Lynchburg-Central Virginia Crisis Intervention

Team wrote a memo to Horizon and Centra employees during the construction and design phase of the PEC warning of many of these shortcomings. *Id.* ¶ 28. At one point in the memo, the individual appears to closely envision the scenario that played out with Plaintiff:

> In considering the physical layout of the assessment center further, I keep returning to thoughts of a "worst case scenario" in which a patient obtains an officer's gun, or is so violent that he/she cannot be physically controlled by security/police present. I am thinking of a situation in which one or more staff (and security possibly) simply need to retreat from the holding area. Since egress through the main door may not be possible, it seems to me that . . . since this would effectively trap those inside, an outside exit should be available from the Work Area. This exit should not be in a direct line with the security door between the Work Area and the Nurses Station/Security Station area.

*Id.* ¶ 30.

## III. DISCUSSION

### A. Unreasonable Seizure

Plaintiff's Count I alleges that Defendants Gillespie, Luck, Barr, and Prater[3] unreasonably seized him in violation of the Fourth Amendment. All four Defendants challenge the merits of this claim in their motions to dismiss. Claims under § 1983 require three elements: "(1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Fletcher v. Brown*, No. 2:15CV00015, 2016 WL 1179226, at *3 (W.D. Va. Mar. 24, 2016) (quoting *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997)).

Specifically, for Plaintiff's Count I claim to survive these motions to dismiss, the allegations in the complaint must demonstrate that (1) Plaintiff's voluntary transfer to the PEC was "seizure" under the Fourth Amendment; (2) if there was a seizure, there was no probable cause; and (3) Defendants are not entitled to a good-faith exception or qualified immunity. *See Jenkins*,

---

[3] Defendant Prater also argues that all the claims against here are time barred under Virginia law. But, because all the claims against her fail on the merits, the Court declines to rule on the issue of timeliness.

119 F.3d at 1159–60. An additional hurdle must be met for Defendants, demonstrating that their actions were done "under color of state law."

## 1. <u>Seizure</u>

A person is "'seized' only when, by means of physical force or show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). "As long as the person … remains free to … walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification." *Id.* at 554. The crucial question is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* Furthermore, if the person has no reason to leave unrelated to the police presence and he passively acquiesces to the officer's show of authority, the "coercive effect of the encounter" can be measured by considering "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Brendlin v. California*, 551 U.S. 249, 255 (2007).

The analysis of whether an encounter was consensual is an objective exercise. The subjective intent of the officer is not relevant (unless, of course, the officer conveys an intention to detain the citizen). *Mendenhall*, 446 U.S. at 554 n.6, 555. Instead, the Court looks to "all of the circumstances surrounding the incident." *Id.* at 554. Relevant factors include, but are not limited to: the number of police officers present, the words used by the officer, the officer's tone of voice and demeanor, whether the officers were in uniform and displayed their weapons, whether the officers made an attempt to block the citizen's departure or restrain his movement, whether the officer physically touched the citizen, and whether the citizen was treated as if suspected of illegal activity. *United States v. Weaver*, 282 F.3d 302, 310 (4th Cir. 2002); *United States v. Gray*, 883 F.2d 320, 322–23 (4th Cir. 1989).

In this case, the only allegations by Plaintiff as to any show of force or his inability to leave are as follows: (1) "[Jonathan] was escorted from the emergency room by armed guards in the early morning of January 11, 2016, to the PEC," and (2) "[Jonathan] was in custody and was not free to leave when he was escorted to the PEC." Dkt. 1 ¶¶ 83–84. Because the second allegation is a straightforward legal conclusion devoid of factual enhancement, the Court is not bound to accept it as true. *Twombly*, 550 U.S. at 555.

As for the first allegation, it is settled law that the simple presence of an armed officer, without some additional factors—like drawing a weapon or making a threatening gesture—is insufficient to objectively signal to a putative arrestee that he is not free to leave. *Mendenhall*, 446 U.S. at 554, 558. Accepting as true that allegation, but without more, the Court must conclude that Defendants' actions, as alleged, could not constitute a seizure when they escorted Jonathan from the emergency room to the PEC. Regardless whether they were correct to transfer him, the complaint alleges that Defendants did nothing more than simply take him from point A to point B. The complaint does not allege, for example, that Defendants brandished weapons, threatened Jonathan during the escort process, or otherwise indicated compliance may be compelled.

Consequently, because there was no unlawful seizure when Defendants moved Jonathan from the emergency room to the PEC, this claim must be dismissed as to Defendants Prater, Gillespie, Luck, and Barr.

## 2. Probable Cause for Seizure

Even if the Court assumes there was a seizure, the facts as alleged substantiate a finding of probable cause for a mental health seizure, undermining Plaintiff's claim for yet another reason. "[P]robable cause to seize a person for a psychological evaluation [exists] when the facts and circumstances within their knowledge and of which they had reasonably trustworthy information

12

were sufficient to warrant a prudent man to believe that the person poses a danger to himself or others." *Cloaninger ex rel. Estate of Cloaninger v. McDevitt*, 555 F.3d 324, 334 (4th Cir. 2009).

Although Defendants argue many facts to support a conclusion that they had probable cause to seize Jonathan for psychological evaluation, they are not all necessarily relevant to the inquiry. Rather, the Court looks only at the "facts and circumstances within the . . . knowledge" of the Defendants, not whatever facts might have been knowable in the abstract. *Id.* at 334. Accordingly, the Court considers the facts alleged in light most favorable to Plaintiff as to what the Defendants knew at the time Jonathan was moved from the ER to the PEC. *Id.*

On its face, the Complaint shows that Prater had ample knowledge of Jonathan's rapidly deteriorating psychological condition. Indeed, Dr. Dunlop informed Prater that Jonathan's case "had turned into an ECO," indicating that she was on notice of the fact that he was susceptible to causing himself or others serious harm. Dkt. 1 ¶¶ 64, 70. When Prater was brought in to take over Jonathan's case, she also interviewed him several times, noted that he was hearing voices, and confirmed Dr. Dunlop's characterization of Jonathan's mental state. *Id.* ¶¶ 70, 72, 79. It is alleged that Prater went so far as to inform Dr. Dunlop that they should "have [the ECO] ready" in case Jonathan "trie[d] to leave, trie[d] to do anything." *Id.* ¶ 80. In totality, the allegations against Prater lead to the conclusion that even if Jonathan was seized by Prater, she did so with probable cause.

Similar knowledge can be imputed to the remaining Defendants. Luck and Barr were both aware that Jonathan's case was an ECO. *Id.* ¶¶ 75–76. Upon removal from the ER to the PEC, Jonathan's psychotic symptoms had worsened. *Id.* ¶ 114. Both security guards were aware of the facts as presented to them by Prater. *Id.* at ¶ 75. In fact, by the time he was in PEC custody, Jonathan's psychosis had worsened to the point it was "obvious," and a Centra nurse on duty "immediately realized" his medical condition to be "extremely dangerous." *Id.* ¶ 122. As with

13

Prater, the allegations in the complaint establish that a reasonable person would have believed that Jonathan posed a danger to himself or others at the time Defendants Luck and Barr allegedly seized him.

Insofar as it related to Defendant Gillespie, he was aware that an ECO had been issued to Jonathan. *Id.* ¶ 109. When Gillespie met with him inside the PEC, Jonathan allegedly was experiencing "severe mental torment under the influence of psychosis and paranoia." *Id.* ¶ 119. When Gillespie attempted to have him sign a voluntary PEC admission form, Jonathan began frantically pacing throughout the area. *Id.* ¶ 123. The apparent nature of his deteriorating condition at this time led to a PEC nurse calling the pharmacy on Jonathan's behalf because it was "imperative" that he receive the drugs Haldol, Ativan and Cogentin "immediately" to relieve his acute psychosis. *Id.* ¶ 127. Thus, the facts as alleged establish that even if Defendants seized Jonathan, they did so with probable cause and therefore the seizure passes constitutional muster.

In sum, the Court concludes that Defendants Prater, Luck, Barr and Gillespie did not unlawfully seize Jonathan when they took him from the ER to the PEC. Moreover, even assuming Defendants did "seize" Jonathan, the allegations in the complaint establish Defendants had probable cause to do so, considering Jonathan's mental state and behavior. Accordingly, the Court will dismiss Count I as to Defendants Prater, Barr, Luck, and Gillespie.

### B.  Excessive Force

Turning to Gillespie alone, Count II alleges use of excessive force in violation of the Fourth and Fourteenth Amendments. To satisfy the requirements under § 1983, the complaint must allege sufficient facts demonstrating that Gillespie deprived Jonathan of a right secured by the Constitution or a federal statute while acting under color of state law.

### 1.  "Under Color of Law"

14

In addressing if Gillespie acted under color of law, Plaintiff merely alleges an ECO was issued and thus, because Gillespie is an SCOP, he acted under color of law by not following ECO procedures. Dkt. 1 ¶¶ 155–61. Standing alone, this allegation does not actually evince any action under the color of law.

Fourth Circuit precedent is clear that simple governmental authority to arrest or use police powers—such as by appointment as a SCOP in Virginia—is, without more, insufficient to implicate government acquiescence of the type required to implicate the Fourth Amendment. *United States v. Day*, 591 F.3d 679, 685 (4th Cir. 2010) ("This mere governmental authorization for an arrest . . . in the absence of more active participation or encouragement is insufficient to implicate the Fourth and Fifth Amendments."); *see also id.* at 685 ("Virginia's regulatory scheme . . . merely permitted [the individuals] to arrest Day; it did not require or even encourage an arrest or any other complained-of action."). Rather, the Fourth Circuit has laid out a two-factor analysis for determining when a private individual acts under color of state law for the purposes of § 1983: (1) "whether the Government knew of and acquiesced in the challenged conduct" and (2) whether the defendant "intended to assist law enforcement or had some other independent motivation." *Day*, 591 F.3d at 683–84; *see also United States v. Jarrett*, 338 F.3d 339, 344 (4th Cir. 2003) (same). For instance, this Court has allowed a similar excessive-force claim to proceed against another Centra-employed SCOP when that defendant worked with two police officers to subdue the plaintiff, and sought arrest warrants at the behest of those officers—the "'active participation or encouragement' that the Fourth Circuit contemplated in *Day*." *Rose v. Centra Health, Inc.*, No. 6-17-cv-12, 2017 WL 3392494, at *11–13 (W.D. Va. Aug. 7, 2017).

Applying these principles to this case, while the Complaint notes that Gillespie "coerce[d] [Jonathan] into admitting himself to the PEC," it does not allege that the ECO was used as a "stick"

to threaten Jonathan or to push him to voluntarily admit himself to the PEC. If Gillespie acted in a manner he otherwise would not have, absent some encouragement—here through an ECO—the imprimatur of state authority may indeed be present. That is to say, if a government official takes a step to encourage a private person to act under color of law, that private party can still be considered acting on behalf of the state if he uses the presumptive state authority in an unlawful manner or in a different way than what was intended. *See Day*, 591 F.3d at 683–84. Absent any allegations to this effect, Plaintiff has failed to plead a necessary element of a use of force claim under § 1983. As pleaded, the Court is forced to speculate as to the alleged coercion used by Gillespie against Plaintiff and whether it was done under the guise or cloak of state authority through the ECO. Consequently, the Court will grant Defendants' motion to dismiss as to the use of force claim, but will do so without prejudice and provide Plaintiff leave to amend. The Court further reserves judgment on the question of qualified immunity.

### C.  Due Process Violation

Count III of the complaint seeks to hold Gillespie, Prater, Luck, and Barr liable for deprivation of due process in violation of the Fourth, Fifth, and Fourteenth Amendments. Dkt. 1 ¶¶ 191–92. The complaint alleges that Jonathan "was the subject of an ECO that entitled him to certain due process, including being placed in actual custodial restraint to protect him from himself and others, and being transferred to a secure and safe facility." *Id.* ¶ 186. Plaintiff argues that this claim "is essentially two-pronged, the first of which involves state law and the second of which does not." Dkt. 34 at 10.

As to the first prong, Plaintiff asserts that the magistrate's ECO order entitled Jonathan to certain rights under state law, such as the rights to be taken into custody, to be evaluated for temporary detention, and to involuntary commitment rights, "which include a hearing and the right

to counsel." *Id.* at 11 (citing Va. Code §§ 38.2-808–814). While Plaintiff acknowledges that "the violation of state law alone cannot form the basis of a due process claim," *id.*, Plaintiff cites the Supreme Court's decision in *Logan v. Zimmerman Brush Company* for the proposition that "[t]he hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except for cause." 455 U.S. 422, 430 (1982). Thus, Plaintiff argues, having been conferred these rights under Virginia law, Jonathan was due some degree of process before they were taken away. With respect to prong two, Plaintiff argues that Jonathan was seized, and as a result, deprived of his liberty. Dkt. 34 at 12. More specifically, Plaintiff argues that Jonathan was entitled to some degree of pre- or post-deprivation procedures under the Constitution, which he did not receive. *Id.*

Plaintiff's due process claim is analogous to the one the Supreme Court considered in *Town of Castle Rock v. Gonzales*, 545 U.S. 748 (2005). *Town of Castle Rock* concerned a plaintiff who brought a Due Process claim based on a failure of defendant police officers to enforce a previously issued a temporary restraining order ("TRO") against her husband after he absconded with their three children. *Id.* at 753. The Supreme Court held that the TRO was not a state-created property interest and thus not enforceable through a section 1983 due process claim. *Id.* at 766–68. In reaching that conclusion, the Court explained that despite language apparently mandating enforcement of the TRO, a "well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes." *Id.* at 760. Moreover, even if enforcement was mandatory, the Court wrote "that would not necessarily mean" that a private citizen has an "entitlement" to the enforcement of such an order. *Id.* at 764–65. And, in any event, the Court concluded that even if there were any such right under state law, that would not necessarily "constitute a 'property' interest for purposes of the Due Process Clause." *Id.* at 766. *See also Graves v. Lioi*, 930 F.3d 307,

328 (4th Cir. 2019). *see also Ky. Dept. of Corr. v. Thompson*, 490 U.S. 454, 462–63 (1989) (recognizing that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion); *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995) (holding that police officer's express promises to protect plaintiff from her violent ex-boyfriend did not create a property interest cognizable in a due process claim). In *Graves v. Lioi*, the Fourth Circuit applied principles from *Town of Castle Rock* and concluded that the mandatory language of an arrest warrant "does not strip police officers of enforcement discretion." 930 F.3d at 328–29.

Like *Town of Castle Rock*, the first question here is whether Virginia gave Plaintiff a right to execution of the ECO. Va. Code § 37.2–808 outlines the procedures for executing an ECO. An ECO is issued upon the finding by a magistrate that the subject is (i) a danger to himself or others, (ii) in need of hospitalization or treatment, and (iii) unwilling to volunteer or incapable of volunteering for such treatment. Va. Code § 37.2–808(A). Further, when an ECO is issued, the subject is taken into custody and transported to a "convenient location to be evaluated" in order to determine if he needs hospitalization or if he should be temporarily detained. Va. Code § 37.2–808(B). Also relevant is Va. Code § 37.2–808(K), which notes that "[a]n emergency custody order shall be valid for a period not to exceed eight hours from the time of execution."

The plain text of the statute does not expressly state whether the immediate execution of an ECO is mandatory. On one hand, the language indicates that the subject of an ECO "shall" be taken into custody for further assessment. On the other hand, the language also anticipates the expiration of an ECO. Given the surrounding language in Virginia Code § 37.2–808(K), it seems more likely that the "expiration" anticipated occurs only if the subject is not found to require a temporary detention within the eight-hour timeframe. There may be discretion upon assessing a patient, but the actual physical act of taking a patient into custody appears non-discretionary. But

18

the narrower reading is counter to the underpinning rationale in *Town of Castle Rock*. The Court there emphasized the "deep-rooted nature of law-enforcement discretion, even in the presence of seemingly mandatory legislative commands." 545 U.S. at 761; *cf. Chicago v. Morales*, 527 U.S. 41, 62 (1999) ("[It is] common sense that *all* police officers must use some discretion in deciding when and where to enforce city ordinances."). Further, the statute at issue fails to clearly indicate any sort of entitlement to enforcement. The procedures surrounding an ECO mention protecting the subject of the ECO but also describe the importance of helping protect others. Va. Code § 37.2–808(A). Moreover, even assuming there were private entitlement to enforcement—and again, there is no indication that is so—*Town of Castle Rock*, *Graves v. Lioi* and the other precedents cited above undermine any argument that Jonathan had any property interest within the meaning of the Due Process Clause in the immediate execution of the ECO. Following the analysis set out in *Town of Castle Rock* and considering the scheme surrounding Virginia's ECO procedures, the Court is left to conclude that there is no entitlement to the execution of an ECO. Accordingly, this count must be dismissed against Prater, Gillespie, Luck, and Barr.

### D. *Monell Claim*

The complaint includes four *Monell*-style claims against Centra on the theory that its policies or customs were the cause of Jonathan's Constitutional deprivations. Namely, the complaint alleges that "Centra maintained an unconstitutional policy or custom of allowing its armed security guards and other employees the direction and discretion to seize patients without due process or probable cause and to use excessive force against patients." Dkt. 1 ¶ 229.

Typically, a private corporation would not be liable under § 1983, but the Fourth Circuit has recognized an exception to this rule where security guards have been appointed as SCOPs. *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 719, 727–28 (4th Cir. 1999) ("*Monell* and its

progeny apply equally to a private corporation that employs special police officers."). This means corporations like Centra may be held liable "*only* when an official policy or custom causes the alleged deprivation of federal rights." *Id.* at 728.

"Municipal policy may be found in written ordinances and regulations, in certain affirmative decisions of individual policymaking officials, or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (internal citations and quotations omitted). "Outside of such formal decision-making channels, a municipal custom may arise if a practice is so persistent and widespread and "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* (internal citations and quotations omitted).

Plaintiff attempts to establish this "policy or custom" of unreasonable seizures and excessive force through similar acts of Centra's agents. These acts include the following:

- The unlawful detention and wounding of a patient who left the hospital against medical advice less than a month after Jonathan was shot

- Several known instances of using a TASER against patients who posed no threat of harm

- Several known instances of the unlawful use of restraints against patients shortly before Jonathan was shot

Dkt. 1 ¶ 202. That's it. Aside from the single incident occurring *after* the incident in question, these other alleged similar acts are vague and generalized. "[A] plaintiff cannot rely upon scattershot accusations of unrelated Constitutional violations to prove either that a municipality was indifferent to the risk of her specific injury or that it was the moving force behind her deprivation." *Carter*, 164 F.3d at 218. Plaintiff's allegedly corroborating incidents are too vague to establish a custom under *Monell*. "[B]y requiring litigants to identify the offending municipal policy with precision, courts can prevent trials from straying off into collateral accusations of

20

marginally related incidents." *Id.* Plaintiff attempts to do the latter in this case. Because Plaintiff fails to establish a policy or custom, no § 1983 liability can attach to Centra, and this claim must be dismissed.

### E. Battery

Under Virginia law, battery is "an unwanted touching which is neither consented to, excused, nor justified." *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009) (*quoting Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003)). "[A] legal justification for the act being complained of will defeat an assault or battery claim." *Id.* When a battery is based on the use of deadly force by a SCOP or police officer, the inquiry mirrors the "objective reasonableness" inquiry in the Fourth Amendment context. *Russell ex rel. Russell v. Wright*, 916 F. Supp. 2d 629, 636 (W.D. Va. 2013). "To determine whether an officer's use of force is excessive, we apply a standard of objective reasonableness." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). "Because the intrusiveness of a seizure by means of deadly force is unmatched, a police officer may use deadly force only if the officer has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* (internal quotations omitted) (citing *Tennessee v. Garner*, 471 U.S. 1, 9 (1985)).

Finally, there may be situations where an officer's initial use of deadly force is justified, but subsequently used deadly force—even just seconds later—is unjustified. "[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005); *see also Harris*, 927 F.3d at 272 ("[E]ven when an initial use of force is objectively reasonable, subsequent applications of force—even moments later—may not be"). *But see Milstead v. Kibler*, 243 F.3d 157, 165 (4th Cir. 2001) ("[C]ourts cannot second guess the split-second judgments of a police

officer to use deadly force in a context of rapidly evolving circumstances, when inaction could threaten the safety of the officers or others.").

Count V alleges that Defendant Gillespie committed a battery against Jonathan. In arguing that his actions were reasonable and that the battery claim should be dismissed, Gillespie focuses on the following: (1) Jonathan admitted he attacked Gillespie and went for his gun; (2) Jonathan stole a TASER and attacked a staff member with it; and (3) Jonathan suffered from a dangerous psychotic condition. Thus, Gillespie contends that his response to Jonathan's actions was reasonable as a matter of law. The Court considers these three points, in addition to the fact that Gillespie was aware of how physically strong Jonathan was, as facts that would support a showing of reasonableness under a use of force analysis. Law enforcement should be afforded latitude in conducting its activities, particularly in making split-second decisions and especially when lives are at stake. However, even if an initial use of force is objectively reasonable, the Court should consider subsequent applications of force to provide a robust and proper reasonableness analysis. *See Waterman*, 393 F.3d at 481.

The allegations in the complaint reflect that Gillespie faced Jonathan—a strong man in a psychotic state, who did not know the difference between right and wrong. Gillespie had witnessed Jonathan take a TASER and attempt to discharge it against another medical staffer, although he ultimately failed to do so successfully. Gillespie then confronted Jonathan when he attempted to grab Gillespie's gun. In response, Gillespie fired multiple shots at Jonathan. And significantly, prior to Gillespie's use of deadly force against Jonathan, no allegations tend to show that Jonathan was trying to flee. Given those facts as alleged, an objectively reasonable person would find it likely that Jonathan could have harmed someone. It is no matter that Gillespie was the only person in the PEC with a firearm, nor is it relevant that the trigger for the events may have been sparked

22

by Gillespie's religious discussion with Jonathan. *Waterman*, 393 F.3d at 477 (4th Cir. 2005) ("[T]he reasonableness of the officer's actions in creating the dangerous situation is not relevant to the Fourth Amendment analysis; rather, reasonableness is determined based on the information possessed by the officer at the moment it is employed.").

But, once Gillespie had shot Jonathan three times, the circumstances as alleged in the complaint changed, making the fourth shot objectively unreasonable. Plaintiff's allegations indicate that Gillespie gave no verbal commands after the third shot, nor did Gillespie make any effort to detain Jonathan. Furthermore, a number of factors diminished after Gillespie had shot Jonathan three times. No longer was Gillespie facing the threat of a strong man advancing toward him or attacking him for his gun. Nor was there the imminent threat of Jonathan harming another staff member. In fact, the allegations in the complaint are that, after having been shot three times, Jonathan lay face-down on the ground, and when he attempted to get up, Gillespie, standing over him, shot him in the back. The allegations in the complaint establish that Gillespie's use of force as to the fourth shot was unreasonable.

Given the totality of the circumstances considered in light most favorable to the Plaintiff as the non-moving party, the Court finds the allegations in the complaint are sufficient to survive the plausibility standard under Federal Rule of Civil Procedure 12(b)(6) to state a claim of battery against Gillespie.

### 1. Respondeat Superior Liability for Battery

Under Virginia law, an employer is liable for an employee's tortious conduct through respondeat superior "where the activity that gave rise to the tortious act was within the scope of the employment." *Meade v. Johnston Mem'l Hosp.*, No. 1:10-CV-00024, 2010 WL 3463639, at *3 (W.D. Va. Sept. 2, 2010) (citing *Comm'l Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 453 S.E.2d

261, 265 (Va. 1995)). The test to determine whether an employee's conduct is within the scope of employment is "whether the service itself, in which the tortious act was done, was within the ordinary course of the employer's business." *Id.* (quoting *Blair v. Def. Servs., Inc.*, 386 F.3d 623, 627 (4th Cir. 2004)). A battery is "permitted when justified in the performance of a law enforcement officer's duties." *White v. Owens*, No. 7:10-CV-00514, 2011 WL 3652592, at *7 (W.D. Va. Aug. 19, 2011); *see Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009) ("Virginia recognizes that police officers are legally justified in using reasonable force to execute their lawful duties."). *But see Gnadt v. Commonwealth*, 497 S.E.2d 887, 888 (Va. App. Ct. 1998) ("[A]n arrest utilizing excessive force is a battery because that touching is not justified or excused and therefore is unlawful.").

Because this Court determined that the facts alleged do not show, as a matter of law, that Gillespie's decision to use lethal force against Jonathan was reasonable, the Court cannot dismiss Plaintiff's *respondeat superior* claim against Centra at this time. The complaint further sufficiently alleges an employer-employee relationship between Centra and Gillespie, and one which plausibly shows that Gillespie acted within the scope of his employment.

### F.  *Negligence*

The negligence claim against Centra alleges several ways in which Centra breached its duty of care to Jonathan. Plaintiff asks the Court to consider each negligence claim in the context of the entire complaint. While the Court takes into account the complaint as a whole in assessing Federal Rule of Civil Procedure 12(b)(6) motions, it does not necessarily follow that a plaintiff has carte blanche to insufficiently allege multiple theories and thereby bind the court to take the sum of the complaint's parts to declare it sufficient. The Court's role is not to develop a plaintiff's

arguments for her. For the reasons discussed below, the Court must grant the request for the dismissal of Plaintiff's negligence claims in Count VI.

### 1. <u>Negligent Hiring</u>

In order to hold a defendant liable for deficient hiring practices, "the plaintiff must show that an employee's propensity to cause injury to others was either known or should have been discovered by reasonable investigation." *A.H. by next friends C.H. v. Church of God in Christ, Inc.*, 831 S.E.2d 460, 473 (Va. 2019) (internal quotations omitted). This cause of action "is based on the principle that one who conducts an activity through employees is subject to liability for harm resulting from the employer's conduct if the employer is negligent in the hiring of an improper person in work involving an unreasonable risk of harm to others." *Se. Apts. Mgmt., Inc. v. Jackman*, 513 S.E.2d 395, 397 (Va. 1999).

Applying these principles here, if the allegations fail to show some sort of propensity that was known or should have reasonably been known to Centra, the Plaintiff cannot sustain this claim. Throughout her complaint, Plaintiff provides a number of allegations regarding Gillespie's hiring. Dkt. 1 ¶¶ 85–105. Not one of those allegations shows a predilection for excessive force or unlawful seizures—much less in the particular manner in which Jonathan was injured. Accordingly, this claim fails because Plaintiff has not alleged any problematic propensity of Gillespie with respect to unlawful seizure or excessive force. Dkt. 24 at 25.

### 2. <u>Negligent Entrustment</u>

To state a claim for negligent entrustment of chattel (in this case, a gun and a TASER), a plaintiff must show that "the owner knew, or had reasonable cause to know, that he was entrusting his [chattel] to an unfit [user] likely to cause injury to others. *Denby v. Davis*, 188 S.E.2d 226, 228 (Va. 1972). "Furthermore, in order to impose liability upon the owner, the plaintiff must prove that

the negligent entrustment of the [chattel] to the tortfeasor was a proximate cause of the accident." *Turner v. Lotts*, 422 S.E.2d 765, 767 (Va. 1992). Similar to the analysis under a theory of negligent hiring, Plaintiff fails to sufficiently allege facts necessary to state a claim for negligent entrustment. Specifically, Plaintiff alleges only Gillespie's general inexperience, stating that he hadn't worked as a police officer since 1976 and that he was 62 when hired. Dkt. 1 ¶¶ 89–90. Additionally, Plaintiff fails to allege any facts suggesting proximate cause between Centra's negligent entrustment and Jonathan's injuries. For these reasons, the claim of negligent entrustment cannot be sustained.

### 3.   Negligent Training and Supervision

Plaintiff tries to bring a negligence claim based on negligent training and supervision under Virginia common law. However, such a cause of action does not exist under Virginia common law. *See Chesapeake & Potomac Tel. Co. of Va. v. Dowdy*, 365 S.E.2d 751, 754 (Va. 1988); *Parrish v. Am. Airlines, Inc.*, 97 Va. Cir. 271, 2017 WL 9917197, *5 (Norfolk Dec. 12, 2017) ("It has been repeatedly concluded that Virginia Courts do not recognize a claim of negligent supervision . . . . Similarly, this Court is not aware of any authority recognizing negligent training in Virginia and a number of courts have declined to recognize negligent training in cases where the cause of action was proposed."); *Porter v. Woods*, 96 Va. Cir. 280, 2017 WL 10966679 at *3 (Norfolk Aug. 2017) ("Numerous Virginia circuit courts have declined to recognize [claims for negligent training]."); *Cleaves-McClellan v. Shah*, 93 Va. Cir. 459 (Norfolk 2016) (relying on *Dowdy* and holding "that negligent supervision is not a recognized cause of action in Virginia."). Plaintiff cites no contrary case law supporting the existence of a negligence claim for negligent training and supervision under Virginia common law. Because there is no state law cause of action for negligent training and supervision in Virginia, this claim must be dismissed.

### 4.   Negligent Failure to Adopt a Policy

Plaintiff further asserts that Centra was negligent in failing to adopt or enforce a reasonably firearms policy. Under Virginia precedent, it is well settled that internally promulgated policies cannot serve as the basis of establishing a duty of care supporting a negligence claim. Dkt. 24 at 28; *see Va. Ry. & Power Co. v. Godsey*, 83 S.E. 1072 (Va. 1915); *Pullen v. Nickens*, 310 S.E.2d 452, 456 (Va. 1983); *Taylor v. O'Neil*, 92 Va. Cir. 303, 304 (Norfolk 2016) (quoting *Hawthorne v. Lavinder*, 72 Va. Cir. 375, 375 (Roanoke Cnty. 2006)) ("It is well settled in Virginia that internal policies and procedures, as 'private rules,' are not admissible to establish a standard of care."); *Owens v. Children's Hosp. of the King's Daughters, Inc.*, 45 Va. Cir. 97, 100 (Norfolk 1997) ("[T]he long standing rule in Virginia is that private rules of conduct are not admissible to show the standard of care.").

Plaintiff alleges that there was negligence because no policy prohibiting firearms in the PEC was enforced or existed. However, Plaintiff cites no precedent illustrating that an *affirmative duty* would exist on the part of Centra to promulgate specific rules with respect to firearm handling. Accordingly, while Centra may be negligent for resulting wrongful or negligent acts flowing from its decisions or directions surrounding the circumstances of a specific incident, Centra cannot be held liable under Virginia law merely for failing to promulgate "a reasonable firearms policy." Dkt. 1 ¶ 222a. This claim is therefore dismissed.

### 5.   Negligent Design and "Failure to Provide Proper Security or a Proper, Safe Facility for Psychiatric Patients"

Plaintiff alleges that Centra failed to provide law enforcement and security a secure place to store their firearms prior to entering the PEC (i.e. a gun locker), failing to separate individuals from staff for screening and admission, and, more generally, failing to provide "structural abilities to avoid the need to escalate the situation into the use of deadly force." Dkt. 1 ¶ 222.

The Supreme Court of Virginia defines proximate cause as an event "which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." *Scott v. Simms*, 51 S.E.2d 250, 253 (Va. 1949) (citation omitted). "[T]here are cases in which the state of the evidence is such that the absence of proximate cause is so apparent that the court is required so to hold as a matter of law . . . ." *Id.* However, these occasions only occur sparingly, and courts have emphasized that dismissal of complaints for lack of proximate cause should only be invoked in rare occasions. *See, e.g.*, *Brembry v. United States*, No. 7:10CV00388, 2011 WL 4357164, at *8 (W.D. Va. Sept. 19, 2011) (Sargent, M.J.); *Haga v. L.A.P. Care Servs., Inc.*, No. 1:01CV00105, 2002 WL 1754485, at *3 (W.D. Va. July 29, 2002) (Jones, J.); *Russo v. United States*, 37 F. Supp. 2d 450, 452 (E.D. Va. 1999) ("[I]n Virginia, questions of proximate cause and foreseeability are questions for the trier of fact to decide and only become a question of law if undisputed facts are susceptible of only one inference."). In Virginia, "the extraordinary manner in which harm occurs may prevent the primary actor's conduct form being the proximate cause of an event." *Dorman v. State Indus.*, 787 S.E.2d 132, 139 (Va. 2016) (citing *Banks v. City of Richmond*, 348 S.E.2d 280, 283 (Va. 1986)). Stated differently, even if a party may be a "but for" cause of an injury, if the intervening event is so unforeseeable, the causal chain cannot run back to the defendant.

Although a claim for liability under this theory is the type which can typically be maintained, Plaintiff failed to allege facts which identify proximate cause on the part of Centra. The complaint simply does not provide enough facts to identify a legal causal relationship between the design decisions by Centra and Jonathan's injuries. *See Rose*, 2017 WL 3392494, at *10 ("[T]he Complaint is devoid of allegations that Centra's negligence was the proximate cause of

28

Plaintiff's injuries."). Plaintiff's allegations are insufficient to show that proximate cause exists in this case.

### 6. __Gross Negligence__

Under Virginia common law, gross negligence requires "complete indifference" and "an utter disregard of prudence amounting to complete neglect of the safety of another." *Town of Big Stone Gap v. Johnson*, 35 S.E.2d 71, 73 (Va. 1943). Plaintiff does not allege facts supporting this heightened standard for gross negligence, only suggesting that Centra's failure to adopt a number of possible internal policies amounted to the inadmissible legal conclusion of gross negligence. Dkt. 1 ¶ 222. For the reasons stated above, the Court grants Centra's motion to dismiss as to all of Plaintiff's claims under Count VI.

### G. *Medical Malpractice*

Lastly, Count VII alleges medical malpractice against Defendant Prater. Prater argues that the doctrine of sovereign immunity protects her from suit with respect to Plaintiff's medical malpractice claim against her. Plaintiff alleges that Prater—along with Centra and two of Jonathan's treating physicians that evening—failed to exercise reasonable care in a variety of ways in their treatment decisions. *See* Dkt. 1 ¶ 228. The only allegations within the Complaint that appear to apply to Prater—rather than Jonathan's treating physicians—are that Defendants "failed to transfer [Jonathan] to another, appropriate facility for treatment," *id.*, namely the secure facility pursuant to the ECO. This issue ultimately turns on whether this transfer to a more appropriate facility can be said to be a discretionary decision rather than a ministerial one.

The doctrine of sovereign immunity applies to individuals where the "government can function only through its servants, and certain of those servants must enjoy the same immunity in the performance of their discretionary duties as the government enjoys." *Messina v. Burden*, 321

S.E.2d 657, 661 (Va. 1984). Defendant Prater acted as a government employee through Horizon's community board, as established pursuant to Virginia Code § 37.2-500.[4] Indeed, she supported the governmental interest of providing publicly funded mental health services through the community services board. Because she was fulfilling her responsibilities under Virginia Code § 37.2-500, the primary inquiry is concerned with whether her acts were discretionary, not ministerial, in nature. *Colby v. Boyden*, 400 S.E.2d 184, 186 (Va. 1991).

To determine whether an employee is entitled to sovereign immunity, Virginia courts look to four different factors: "(1) the nature of the function the employee performs; (2) the extent of the government's interest and involvement in the function; (3) the degree of control and direction exercised over the employee by the government; and (4) whether the act in question involved the exercise of discretion and judgment." *Id.* at 184 (citations omitted). As the moving party, the Defendants bear the burden of proof on all issues of fact related to their plea of sovereign immunity. *See Whitley v. Commonwealth*, 538 S.E.2d 296, 302 (Va. 2000). The parties agree that this four-factor test set out by the Supreme Court of Virginia controls, and that Ms. Prater's job duties relevant to this incident were in furtherance of an important governmental objective. Dkt. 33 at 13. As stated above, the sole issue is whether Prater's duties performed that evening were discretionary or ministerial.

---

[4] By law, in order to provide comprehensive mental health, developmental, and substance abuse services within a continuum of care, the General Assembly has directed community services boards to function as the single point of entry into publicly funded mental health, developmental, and substance abuse services. Va. Code § 37.2-500(D). Community services boards receive state-controlled funding to provide mental health services to the public. *Id.* §§ 37.2-500, 508, 509. Community services boards are created by the cities and counties they serve. *Id.* § 37.2-500. Community services boards are immune entities under the law. *See, e.g., Peterson v. Commonwealth*, 80 Va. Cir. 21 (2010), *rev'd on other grounds*, 749 S.E.2d 307 (Va. 2013); *Lohr v. Larsen*, 431 S.E.2d 642, 646 (Va. 1993).

Plaintiff argues that under the governing law, the ECO *shall* be executed so that the patient can be safe from himself and others and receive the evaluation and treatment laid out by Virginia Code § 38.2-808. Plaintiff argues that it would make little sense for a government employee to receive sovereign immunity for knowingly doing something directly contrary to the express, nondiscretionary policy of Virginia as codified in the Virginia Code. Dkt. 33 at 14. Prater in turn argues that "Plaintiff recites no allegations of ministerial duties in her complaint, and indeed, the [P]laintiff could not, with a straight face, allege that performing a mental health evaluation and making recommendations for the treatment and care of a patient alleged to be in a psychotic state did not require the use of her judgment and discretion as a mental health professional." Dkt. 39 at 12.

Prater interviewed Jonathan and completed an evaluation as required under Virginia Code § 37.2-805.[5] Upon her completion of the interview, she determined that he could voluntarily admit himself for treatment at the PEC. Dkt. 39 at 20. Further, even if the Prater served the ECO on Jonathan, Prater would have been the designated individual to evaluate him and determine if he met the criteria for a temporary detention. *Id.* Dr. Dunlop retained Prater to conduct an evaluation of Jonathan. Prater's job required her to make discretionary decisions as to whether Jonathan's mental health was deteriorating, whether his mental condition was properly managed or Jonathan should be sedated prior to transfer to the PEC, and whether he should be transferred to a different treatment facility. Taken as a whole, and in the context of the allegations of the complaint, the

---

[5] Virginia Code § 37.2-805 (Voluntary Admission) provides in relevant part "Any state facility shall admit any person requesting admission who has been (i) screened by the community services board or behavioral health authority that serves the county or city where the person resides or, if impractical, where the person is located, (ii) examined by a physician on the staff of the state facility, and (iii) deemed by the board or authority and the state facility physician to be in need of treatment, training, or habilitation in a state facility."

Court concludes that Virginia law entrusted Prater to make healthcare decisions on Jonathan's behalf—entailing the exercise of her own judgment and discretion. *See Town of Castle Rock*, 545 U.S. at 760.

Ultimately, Prater's role was not a ministerial one—it was discretionary and therefore entitles her to sovereign immunity on this count. Therefore, Prater's motion for dismissal of all the counts against her is granted.

### IV. Conclusion

For the foregoing reasons, the Defendants' motion to dismiss will be granted in part and denied in part. As to Count I, III, IV, VI, and VII the Court will grant Defendants' motions to dismiss as to all Defendants. As to Count II, the Court will dismiss without prejudice, and with leave to amend, Plaintiff's use of force claim against Gillespie. The motion to dismiss the battery claim under Count V will be denied.

An appropriate Order will issue, and the Clerk of Court is hereby directed to send a copy of this Memorandum Opinion to all counsel of record.

ENTERED this ___30th___ day of November, 2020.


NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

32